UNITED STATES, Appellee,

v.

John B. SWIFT, Staff Sergeant,
U.S. Air Force, Appellant.

No. 98–5012.
Crim.App. No. 32447.

U.S. Court of Appeals for
the Armed Forces.

Argued March 9, 1999.*

Decided Aug. 31, 2000.

---

* This case was argued at the United States Air Force Academy, Colorado Springs, Colorado, as part of Project Outreach. *See United States v. Martinez*, 52 MJ 22, 23 n. * (1999).

EFFRON, J., delivered the opinion of the Court, in which CRAWFORD, C.J., GIERKE, J., and COX, S.J., joined. SUL-LIVAN, J., filed an opinion concurring in part and dissenting in part.

For Appellant: *Captain Michael J. Apol* (argued); *Colonel Douglas H. Kohrt* (on brief); *Lieutenant Colonel Kim L. Sheffield.*

For Appellee: *Captain Steven D. Dubriske* (argued); *Colonel Anthony P. Dattilo* and *Major Ronald A. Rodgers* (on brief); *Lieutenant Colonel Michael J. Breslin.*

Judge EFFRON delivered the opinion of the Court.

A general court-martial composed of officer members convicted appellant, pursuant to mixed pleas, of making a false official statement (3 specifications), writing bad checks (2 specifications), bigamy, and impeding an investigation, in violation of Articles 107 and 134, Uniform Code of Military Justice, 10 USC §§ 907 and 934, respectively. Appellant was sentenced to a bad-conduct discharge and reduction to the grade of E–1. The convening authority approved the sentence as adjudged. In an unpublished opinion, the Court of Criminal Appeals affirmed the findings and sentence but ordered that appellant receive administrative relief from the improper execution of the adjudged reduction in grade.

On appellant's cross-petition, we granted review of the following issue:

WHETHER THE MILITARY JUDGE ERRED IN FAILING TO SUPPRESS STATEMENTS APPELLANT MADE TO HIS FIRST SERGEANT AFTER HAVING BEEN SUBJECTED TO REPEATED AND PERSISTENT QUESTIONING BY HIS FIRST SERGEANT WITHOUT HAVING BEEN FIRST ADVISED OF HIS RIGHTS UNDER ARTICLE 31, UCMJ.[1]

We hold that the military judge erred in admitting the verbal statements at issue in the absence of rights' warnings under Article 31(b), UCMJ, 10 USC § 831(b), but did not err in admitting the divorce decree into evidence. The error was prejudicial as to one specification on findings, but harmless as to the sentence. *See* Art. 59(a), UCMJ, 10 USC § 859(a).

## I. FACTS

### A. *Questions Concerning Appellant's Marital Status*

On Friday, March 8, 1996, appellant's commander, Captain (Capt) Myatt, received a telephone call from a woman who identified herself as appellant's wife, JS (hereafter referred to as "the first Mrs. Swift"). The first Mrs. Swift stated that she had received a telephone call that morning from a woman who had identified herself as SS (hereafter referred to as "the second Mrs. Swift"). According to the first Mrs. Swift, the second Mrs. Swift had made the following points during their telephone conversation: (1) the second Mrs. Swift currently was married to appellant; (2) the first Mrs. Swift no longer was married to appellant; (3) appellant had divorced the first Mrs. Swift in 1994; (4) the divorce took place in Pike County, Kentucky; and (5) the divorce papers were in the possession of the second Mrs. Swift.

1. The initial filing in our Court, which concerned an unrelated issue certified by the Judge Advocate General under Article 67(a)(2), UCMJ, 10 USC § 867(a)(2)(1989), was disposed of by order on September 30, 1998. 50 MJ 351.

The first Mrs. Swift told Capt Myatt that she had no previous knowledge of either the second Mrs. Swift or a divorce. The first Mrs. Swift added that to the best of her knowledge, she was still married to appellant and had not been divorced. She told Capt Myatt that after her telephone conversation with the second Mrs. Swift, she contacted the Pike County courthouse, and a clerk had told her there was no record of such a divorce on file in that county.

The first Mrs. Swift and appellant had been living apart for some time. She told Capt Myatt that she did not believe she was divorced since she had not received any notice that appellant was seeking a divorce and had not signed any paperwork. She asked Capt Myatt for assistance in determining whether there had been a divorce and whether she remained eligible for military medical care. The first Mrs. Swift concluded her conversation with Capt Myatt by telling her that, if appellant had married the second Mrs. Swift without first obtaining a divorce, she wanted to press charges for the offense of bigamy.

Capt Myatt related this information to appellant's first sergeant, Master Sergeant (MSgt) Vernoski. MSgt Vernoski was familiar with appellant's marriage to the first Mrs. Swift because, in the fall of 1995, MSgt Vernoski had counseled appellant for failing to support his wife, the first Mrs. Swift. At that time, MSgt Vernoski assisted appellant in setting up an allotment for the first Mrs. Swift. Until learning of the phone call to Capt Myatt, MSgt Vernoski was under the impression that the first Mrs. Swift and appellant remained married.

Capt Myatt and MSgt Vernoski reviewed appellant's emergency data card in the unit mobility folder, which still listed the first Mrs. Swift as appellant's wife. Capt Myatt and MSgt Vernoski then went to the personnel office to check appellant's records. Appellant's file included several copies of DD Form 1172, the form used to enroll or disenroll military members and dependents from the Defense Eligibility Enrollment Reporting System (DEERS) for purposes of health care eligibility. According to these records, ap-

pellant had disenrolled the first Mrs. Swift and had enrolled the second Mrs. Swift as his spouse. The form indicated that the first Mrs. Swift became ineligible for benefits on September 14, 1994. An official at the personnel office advised Myatt and Vernoski that a spouse could be disenrolled only if the servicemember provided a copy of a divorce decree. The personnel official noted that appellant's emergency data card in the personnel office still listed the first Mrs. Swift as appellant's spouse, but she also recalled that appellant was in the process of revising that card.

Shortly thereafter, Capt Myatt and MSgt Vernoski visited the base legal office, where they discussed several military justice matters with the chief of military justice. During this visit, MSgt Vernoski described the phone call from the first Mrs. Swift and related what they had learned at the personnel office. MSgt Vernoski later testified that he had brought this matter to the attention of the chief of military justice "because it was unusual" and he had "never seen or come across a bigamy case." The chief of military justice recalled that MSgt Vernoski and Capt Myatt mentioned, during this meeting, "the troop and his potential bigamy to me." Later in the day, Capt Myatt and MSgt Vernoski decided that they would confront appellant Monday morning.

On Monday, March 11, before they confronted appellant, MSgt Vernoski received a call from the first Mrs. Swift. She reiterated what she previously had told Capt Myatt and gave MSgt Vernoski the name and telephone number of the clerk in the Pike County courthouse with whom she had spoken. According to the first Mrs. Swift, she told MSgt Vernoski that she did not "think there was a divorce" and added that she "didn't think it was legal." MSgt Vernoski testified that he had never heard of anyone being divorced without that person's knowledge, but thought that it could be possible. After the phone call from the first Mrs. Swift and prior to meeting with appellant, MSgt Vernoski opened the Manual for Courts–Martial and reviewed the Manual's provisions concerning the offense of bigamy, including the elements

and the maximum punishment. According to MSgt Vernoski, he looked at the Manual because he was "curious," as he had never had a "case like this before."

MSgt Vernoski, who subsequently testified that he had called appellant into his office to "hear his side of the story," did not advise appellant of the right to remain silent or the other self-incrimination rights under Article 31(b). He told appellant of the "accusations" made by the first Mrs. Swift. Appellant responded that he had divorced the first Mrs. Swift in September 1994. Immediately upon hearing appellant state that he had been divorced in 1994, MSgt Vernoski reminded appellant that in the fall of 1995, just a few months earlier, appellant had stated that he still was married to the first Mrs. Swift. Appellant responded by claiming that he had not made such a statement.

Appellant then provided MSgt Vernoski with the name of an attorney who, according to appellant, had represented him in the divorce proceeding. Appellant also suggested that the first Mrs. Swift might be trying to get him into trouble. MSgt Vernoski responded by telling appellant that "she can get you in trouble" and showed him the maximum punishment for bigamy from the Manual for Courts–Martial.

At the conclusion of the conversation, MSgt Vernoski directed appellant to provide him with a copy of his divorce decree. Appellant said that he would bring a copy the next morning. Later that day, MSgt Vernoski visited the chief of military justice at the base legal office and told him about his conversation with appellant. He later noted that he had visited the chief of military justice on this matter "because I normally keep him in the loop regarding 'potential crimes' in the squadron."

B. *Production of the Divorce Decree*

When appellant failed to appear with the divorce decree on Tuesday morning, MSgt Vernoski summoned him. Appellant arrived without the paperwork, explaining that his attorney, who was in court that morning, would fax a copy of the decree to the squadron later in the day.

On Tuesday afternoon, appellant delivered certain documents to MSgt Vernoski, who determined that the documents were not responsive because they pertained to child custody rather than divorce. He told appellant that he needed to see a divorce decree to verify his divorce, and appellant promised to deliver the divorce decree at 0730 hours the following morning.

The next day, appellant again failed to report to MSgt Vernoski's office. When summoned, appellant arrived without the paperwork, explaining that his attorney did not open his office until 9:00 a.m. MSgt Vernoski directed appellant to report to him every hour until he produced the divorce papers. Just before 2:00 p.m., Wednesday, March 13, 1996, appellant delivered a document to MSgt Vernoski that he described as his divorce decree. A cover letter and a page of the document were missing from the document, and appellant promised to deliver the missing items the next morning. After this meeting, MSgt Vernoski did not discuss the matter again with appellant. Appellant never produced the missing papers.

The document appeared to be unusual to MSgt Vernoski, so he took it to the chief of military justice because "[he] wasn't sure if it was legal" and wanted "to have it checked out." Together, MSgt Vernoski and the chief of military justice examined the document. The first thing that struck them as unusual was that the first Mrs. Swift had not signed the document. After further review, they also noticed several misspellings and typographical errors. The document was purportedly signed by a Circuit Court Judge in Pike County and filed at the Pike County Courthouse. The document indicated that it had been filed on September 14, 1994, the same date listed on the DEERS form. With MSgt Vernoski in the office, the chief of military justice called the civilian attorney identified by appellant as his attorney in the divorce proceedings. The attorney responded that, although he had represented appellant in a child-custody case, he had not represented him in a divorce action.

The following morning, the chief of military justice called the Pike County Court-

house to verify whether the divorce decree had been filed at the court. The Deputy Clerk of the Court informed him that the document had not been filed with that court or signed by anyone sitting as a Circuit Court Judge in Pike County. That same day, the second Mrs. Swift brought MSgt Vernoski a copy of what she believed was appellant's divorce decree from the first Mrs. Swift. The document was identical to what appellant had provided him the previous day.

Soon thereafter, appellant was charged with a number of offenses, including: (1) that he made false official statements between March 11 and 13, 1996, when he said that he was divorced and that the named civilian attorney represented him in that action; (2) that he made a false official statement when he presented a false divorce decree to MSgt Vernoski on Wednesday, March 13, 1996; (3) that he committed obstruction of justice by impeding MSgt Vernoski's investigation by presenting a false divorce decree to MSgt Vernoski; and (4) that he committed bigamy.

## C. The Motion to Suppress

At trial, appellant moved to suppress all statements he had made to MSgt Vernoski and all evidence derived therefrom, including the purported divorce papers that appellant had given to MSgt Vernoski. The motion alleged a failure to give warnings under Article 31(b). Defense counsel indicated that the motion, if granted, would require dismissal of the two false official statement specifications and the bigamy charge. The defense did not tie the motion to the obstruction of justice charge and has not done so on appeal.

The military judge denied the motion to suppress. He concluded that "there were insufficient circumstances that caused or reasonably should have caused Sergeant Vernoski to suspect the accused of the criminal offense of bigamy." With respect to the false official statement charges, he also concluded that "there was no evidence made known to Sergeant Vernoski that reasonably should have caused him to suspect that the accused was possibly going to commit other offenses under the UCMJ in the course of producing the divorce decree."

## D. The Charge of Impeding MSgt Vernoski's Investigation

The Government charged appellant with obstruction of justice for wrongfully endeavoring to impede an investigation into his marital status by giving MSgt Vernoski a document purporting to be a divorce decree from the first Mrs. Swift, which he knew to be false. At trial, the Government's theory was that appellant's "submi[ssion of] this phony divorce decree [was] just part and parcel of the impeding an investigation charge.... He provided it in the hopes that Vernoski would be satisfied with it, and nothing further would happen to him." Trial counsel maintained that "[appellant] did all these series of lies in hopes of misleading Vernoski, in misdirecting him so that it would take the pressure off of him, so that he wouldn't get in any trouble." Trial counsel further argued that appellant's conduct was "prejudicial to good order and discipline" because of the "way the military justice system works, and the way our disciplinary system works in the military, and the role and duty of the first sergeant. When he lies to his first sergeant, that has a direct impact on good order and discipline in a unit."

With regard to the obstruction of justice charge, the military judge instructed the members that they must find that appellant presented a false document to MSgt Vernoski, in a case against himself, against whom he had reason to believe that there were or would be criminal proceedings pending, with the intent to impede the due administration of justice. The military judge also informed the members that the charged misconduct must be prejudicial to good order and discipline in the armed forces.

## II. DISCUSSION

### A. General Principles Concerning the Rights' Warning Requirement

Article 31(a) of the Uniform Code of Military Justice provides that a person subject to the Code may not "compel any person to incriminate himself or to answer any question the answer to which may tend to incriminate him." Article 31(b) implements the privilege against self-incrimination through a

rights' warning requirement, providing that no person subject to the Code may

interrogate, or request any statement from an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

Congress established this statutory warning requirement in the aftermath of World War II, long before the Supreme Court's decision in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), mandated rights' warnings in civilian society. *Miranda* specifically cited Article 31 as a precedent for requiring warning persons of the privilege against self-incrimination. *Id.* at 489, 86 S.Ct. 1602.

The rights' warning requirements under *Miranda* represent judicially created, constitutionally based guidelines designed to protect the privilege against self-incrimination. *See Dickerson v. United States,* —— U.S. ——, ——, 120 S.Ct. 2326, 2334, 147 L.Ed.2d 405 (2000). As the product of constitutional adjudication, these guidelines are not "immutable," but are subject to such modifications and exceptions as the judiciary may deem necessary or appropriate in the course of litigation. *See id.* at 2335.

The primary source of the rights' warning requirements in military law is a statutory enactment, not constitutional adjudication. Congress has provided members of the armed forces with a rights' warning requirement that is broader than the warnings required in a civilian setting as a matter of constitutional law under *Miranda.* Article 31(b) mandates rights' warnings for anyone "suspected of an offense," whereas *Miranda* warnings are required only in circumstances amounting to "custodial interrogation." *Compare* 10 USC § 831(b) *with* 384 U.S. at 498, 86 S.Ct. 1602. In addition, Congress has expressly provided in Article 31(d) that "[n]o statement obtained from any person in violation of this article ... may be received

in evidence against him in a trial by court-martial." *See* Part IID, *infra.* The broad application of the warning requirement under Article 31 to all suspects, not just those who are in custody, and the statutory restriction on admissibility of unwarned statements reflect a decision by the post-World War II Congress—which included many veterans familiar with the military justice system and its relationship to military missions and operational requirements—that the unique circumstances of military service required specific statutory protections for members of the armed forces. *See* Pub.L. No. 81–506, Ch. 169, § 1 (Art. 31), 64 Stat. 118 (1950); *cf.* Hearings on H.R. 2498 Before a Subcomm. of the House Armed Services Comm., 81st Cong., 1st Sess. 984 (1949).

In the armed forces, a person learns from the outset of recruit training to respond promptly to the direct orders and the indirect expectations of superiors and others, such as military police, who are authorized to obtain official information. Failure to respond to direct orders can result in criminal offenses unknown in civilian life, *see, e.g.*, Arts. 90 and 91, UCMJ, 10 USC §§ 890 and 891, respectively. Failure to respond to the expectations of military life can lead to charges of dereliction of duty, *see, e.g.*, Art. 92, UCMJ, 10 USC § 892, as well as serious administrative consequences, *see, e.g.*, Department of Defense (DoD) Directive 1332.14 Enlisted Administrative Separations (1993).

In such an environment, a question from a superior or an investigator is likely to trigger a direct response without any consideration of the privilege against self-incrimination. The Article 31(b) warning requirement provides members of the armed forces with statutory assurance that the standard military requirement for a full and complete response to a superior's inquiry does not apply in a situation when the privilege against self-incrimination may be invoked. *See United States v. Gibson,* 3 USCMA 746, 752, 14 CMR 164, 170 (1954).

Another special feature of military life is the blending of both administrative and law enforcement roles in the performance of official duties. Officers, and non-commissioned

officers (NCOs) in particular, have broad responsibility not only for the accomplishment of specific missions, but also for the health, welfare, morale, good order, and discipline of their subordinates. As a result, a service-member may perceive that a question from an officer or NCO is being asked for administrative purposes, although the purpose actually may be to acquire information for use in disciplinary proceedings. As one commentator has noted:

> [M]ilitary suspects may know in a general sense that they have a right to remain silent, and they may know the consequences of waiving that right, but they may not be aware that they face adversarial situations where they may want to exercise that right. For example, a suspect may believe that a platoon sergeant is inquiring about personal finances to help the suspect balance a bank account. The suspect does not realize that the sergeant is asking the questions in a law enforcement capacity, to get evidence against the soldier for later use at a court-martial.

Supervielle, *Article 31(b): Who Should Be Required to Give Warnings?*, 123 Mil. L.Rev. 151, 187 (1989).

Our case law has interpreted Article 31 in a manner that recognizes the difference between questioning focused on the accomplishment of a military mission, including an administrative function, and questioning to elicit information for use in disciplinary proceedings. *See, e.g., United States v. Brown*, 40 MJ 152, 154 (CMA 1994); *United States v. Shepard*, 38 MJ 408 (CMA 1993). In some circumstances, there is likely to be a mixed purpose, and the matter must be resolved on a case-by-case basis.

In general, we have held that Article 31(b) requires rights' warnings if: (1) the person being interrogated is a suspect at the time of the questioning, and (2) the person conducting the questioning is participating in an official law enforcement or disciplinary investigation or inquiry. *See United States v. Moses*, 45 MJ 132, 134 (1996). Whether a person is a suspect is an objective question that "is answered by considering all the facts and circumstances at the time of the inter-

view to determine whether the military questioner believed or reasonably should have believed that the servicemember committed an offense." *United States v. Good*, 32 MJ 105, 108 (CMA 1991). Whether the questioning was part of a law enforcement or disciplinary investigation "is determined by assessing all the facts and circumstances at the time of the interview to determine whether the military questioner was acting or could reasonably be considered to be acting in an official law-enforcement or disciplinary capacity." *Id.; accord United States v. Davis*, 36 MJ 337, 340 (CMA 1993), *aff'd on other grounds*, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). Questioning by a military superior in the immediate chain of command "will normally be presumed to be for disciplinary purposes." *Good*, 32 MJ at 108; *see also United States v. Loukas*, 29 MJ 385, 389 n. * (CMA 1990). The presumption is not conclusive. *See United States v. Pittman*, 36 MJ 404, 407 n. 7 (CMA 1993). When there is a motion to suppress a statement on the ground that rights' warnings were not given, we review the military judge's findings of fact on a clearly-erroneous standard, and we review conclusions of law *de novo*. *United States v. Ayala*, 43 MJ 296, 298 (1995); *Moses, supra* at 135.

### B. *Appellant's Status As A Suspect*

Military pay and benefits are closely tied to marital status and the status of dependents. *See, e.g.*, 10 USC §§ 1076, 1077, and 1079; 37 USC §§ 401, 403, 406, and 407. Officers and NCOs have a legitimate administrative need to ensure that such benefits are provided to those who are entitled to them and that they are not provided to those whose eligibility status may have changed. The role of a first sergeant is multifaceted, and as such, MSgt Vernoski's duties included addressing questions about dependent entitlements. *See* para. 1.2, Air Force Instruction 36–2113, The First Sergeant (1 August 1996).

Given the plethora of diverse benefit programs administered by a host of different DoD organizations, members of the armed forces are well aware of the significant poten-

tial for errors in the collection, processing, and storage of personnel information. In this context, information coming to the attention of a military official that raises questions about the eligibility status of a servicemember's spouse or dependents does not, in itself, establish a basis for designating that member as a suspect for purposes of Article 31, even if the official has a "hunch" that further inquiries may disclose a crime. *Cf. United States v. Meeks*, 41 MJ 150, 161 (CMA 1994)

■ In the present case, however, the command had much more than a hunch that appellant had committed an offense. MSgt Vernoski brought appellant's situation to the attention of the chief of military justice on Friday afternoon because he regarded it as "unusual" and he had "never seen or come across a bigamy case." The chief of military justice described the conversation as addressing a "potential bigamy case in their unit." These circumstances underscore that this was more than simply visiting the legal office to discuss an administrative matter. MSgt Vernoski and Capt Myatt had good reason to suspect appellant of bigamy at that time, based upon the following information: (1) the first Mrs. Swift had been called by the second Mrs. Swift, a person claiming to be appellant's wife, and the second Mrs. Swift had asserted there was a divorce in Pike County, Kentucky; (2) the first Mrs. Swift had never signed a divorce decree and had not been provided any notice that her husband was seeking a divorce; (3) to the best of the first Mrs. Swift's knowledge, she was still married to appellant; (4) the first Mrs. Swift had determined there was no record of such a divorce in Pike County; (5) if there had been no divorce, the first Mrs. Swift wanted appellant prosecuted for bigamy; (6) as recently as the fall of the previous year, MSgt Vernoski had counseled appellant about matters related to appellant's marriage to the first Mrs. Swift, during which appellant told him that he was still married to her, yet the second Mrs. Swift asserted that a divorce had taken place more than 2 years ago—a divorce which, according to the first Mrs. Swift, was not recorded in the county referred to by the second Mrs. Swift; (7) several current military records still listed the first Mrs. Swift as appellant's wife; and (8) the first Mrs. Swift had been disenrolled as a beneficiary under DEERS, and the second Mrs. Swift had been enrolled as appellant's spouse under DEERS.

On Monday morning, prior to confronting appellant, MSgt Vernoski's concerns about the case led him to review the provisions of the Manual for Courts–Martial concerning the offense of bigamy. His review of the Manual was not simply preparation for a worst case scenario. The grounds for suspecting appellant of bigamy were reinforced by a call he received from the first Mrs. Swift prior to his meeting with appellant, in which she reiterated that she did not think the divorce "was legal" and provided him with the name and phone number of the clerk with whom she had spoken at the Pike County Courthouse. When appellant reported, as ordered, MSgt Vernoski began the interrogation by setting forth the "accusations" made by the first Mrs. Swift and asking appellant to respond.

Under the objective test, we conclude as a matter of law that these circumstances demonstrate that MSgt Vernoski "reasonably should have believed" that appellant was a suspect with respect to the offense of bigamy prior to this interrogation. *See Good, supra* at 108. The fact that MSgt Vernoski was hopeful that appellant would be able to clarify his marital status, just as he had been able to clarify prior problems with his wife's allotment, does not lead to a different result. In light of the relatively low quantum of evidence required to treat an individual as a suspect, MSgt Vernoski's hope that events would exonerate appellant was not incompatible with his responsibility to treat appellant as a suspect based upon the amount of information about the possibility of bigamy that he had acquired before confronting appellant. It is not unusual for a superior to be hopeful that circumstances will vindicate a subordinate, particularly when that subordinate has proved trustworthy in the past. Such a feeling, no matter how well motivated, does not deprive a member of the armed forces of the right to be warned under Article 31(b) when the objective facts point to the subor-

dinate as a suspect. Under the circumstances of this case, we find that a reasonable person would have considered appellant a suspect, requiring a rights' warning advisement. *See United States v. Muirhead*, 51 MJ 94 (1999)(military judge erred when he relied upon the subjective opinions of the agents as to whether Article 31(b) warnings were required where facts supported finding that reasonable person would have suspected accused of an offense.)

### C. Questioning By A Military Superior: Application of the Disciplinary Presumption

Under our case law, we also consider whether MSgt Vernoski was acting in a law enforcement or disciplinary capacity in light of the "strong presumption" that questioning by a military superior in the "chain of command" is part of a "disciplinary" investigation. *Good, supra* at 108. As discussed in Part IIB, *supra*, although MSgt Vernoski had appropriate administrative concerns about appellant's marital status, the circumstances of this case led to significant disciplinary considerations in the conduct of the investigation.

From the initial telephone call from the first Mrs. Swift to the first confrontation with appellant, the nature of the actions taken by MSgt Vernoski and Capt Myatt underscore the priority they placed on military justice implications—including their joint visit to the personnel office and the base legal office, their consultation with the chief of military justice concerning a "potential bigamy case," MSgt Vernoski's study of the bigamy provisions in the Manual for Courts-Martial, and MSgt Vernoski's ordering of appellant to report to his office to respond to the "accusations" made by the first Mrs. Swift.

Based on the foregoing considerations, in the context of the information provided by the first Mrs. Swift and the information developed through their own inquiries, we conclude as a matter of law that the Government failed to rebut the strong presumption that MSgt Vernoski's interrogation was part of an

investigation that included disciplinary purposes. Under the circumstances, he should have provided appellant with the statutorily required rights' warnings, including the warning that he did not have to "make any statement regarding the offense" of which he was suspected. Art. 31(b). Accordingly, we hold that the military judge erred when he determined that rights' warnings were not required under Article 31(b).

### D. Admissibility of Unwarned Statements

We next examine whether the verbal statements, although unwarned, were nonetheless admissible. Congress, in Article 31(d), provided a strict enforcement mechanism to implement the rights' warning requirements in Article 31(b):

> No statement obtained from any person in violation of this article, or through the use of coercion, unlawful influence, or unlawful inducement may be received in evidence against him in a trial by court-martial.

■ This provision, like Article 31(b), was established by Congress in the aftermath of World War II. Since then, Congress has not exempted any of the substantive offenses under the UCMJ from the coverage of Article 31(d), no matter how serious. Article 31(d) applies to all substantive crimes, including offenses that have a critical impact on good order, discipline, and national security, such as murder, rape, robbery, aiding the enemy, mutiny, espionage, spying, and making false official statements. *See United States v. Price*, 7 USCMA 590, 23 CMR 54 (1957) (invalidating, as inconsistent with Article 31, a provision of the Manual for Courts-Martial that permitted use of a statement obtained in violation of Article 31(b) to prove a charge of making a false official statement).

More than 40 years have passed since we observed in *Price* that the express language of Article 31 did not permit a false official statement prosecution to be based upon an unwarned statement. Congress has amended the UCMJ numerous times since *Price* was decided in 1957, but none of the amendments has modified the clear limitations in Article 31(d).[2]

---

**2.** During the same period, by contrast, Congress endeavored to circumscribe the exclusionary rule

After *Price,* the Army issued the following guidance with respect to the impact of that case on the Manual for Courts–Martial:

> **Notwithstanding provisions of par. 140***a***, MCM, to the contrary, a prosecution for making a false official statement is not exempt from restrictions of Art. 31 regarding pretrial statements of an accused or suspected person.** Accordingly, when a statement is obtained from an accused who has not been warned of his right against self-incrimination and the circumstances are such that the warning is required by Art. 31, the statement is inadmissible even though the case in which it is offered is a prosecution for making a false official statement.

U.S. Army, 1959 Cumulative Pocket Part to the Manual for Courts–Martial, United States, 1951, at 71 (emphasis in original). The President, in a subsequent revision of the Manual, expressly provided that "in a case in which a statement of the accused so obtained [in violation of applicable warning requirements] is charged as being false, it cannot be received in evidence to show that he made it." Para. 140*a*(6), Manual for Courts–Martial, United States, 1969 (Revised edition); *see* Analysis of Contents, Manual for Courts–Martial, United States, 1969, Revised Edition at 27–11 (Dep't of the Army Pamphlet 27–2 (1970)) (citing *Price*).

The 1951 Manual, in a separate provision regarding impeachment of witnesses, provided that an accused who testified as a witness could not be cross-examined on the basis of a statement obtained in violation of applicable rights' warning requirements, para. 153*b*(2)(c), and this provision was retained with minor modifications in the 1969 Manual. Subsequently, in *United States v. Jordan,* 20 USCMA 614, 44 CMR 44 (1971), we considered the impact of the Manual's rule in a situation where the member received rights' warnings under Article 31 but did not receive the right-to-counsel warnings required by *United States v. Tempia,* 16 USCMA 629, 37 CMR 249 (1967) (holding that the warnings required by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), apply to custodial interrogations in the armed forces). Although we concluded in *Jordan* that the statement could not be used for impeachment based on the Manual's restrictions, we noted that the President was not precluded from amending the Manual to permit impeachment of a testifying accused through use of a statement obtained without provision of such warnings. *Jordan* was based on the premise that the "shield" provided by the rights' warning requirements "cannot be perverted [by a testifying defendant] into a license to use perjury by way of a defense, free from the risk of confrontation with prior utterances." 20 USCMA at 617, 44 CMR at 47 (quoting *Harris v. New York,* 401 U.S. 222, 226, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971)).

Despite the invitation for change set forth in *Jordan,* the two significant revisions of the Manual for Courts–Martial adopted in the 1970s did not address the impeachment issue. *See* Exec. Order No. 11835, 40 Fed.Reg. 4247 (1975); Exec. Order No. 12018, 42 Fed.Reg. 57943 (1977). The Manual continued to preclude impeachment by an unwarned statement until the evidentiary material in the Manual, which included extensive guidance and examples, was replaced entirely by the Military Rules of Evidence in 1980. Chapter XXVII, Manual For Courts–Martial, United States, 1969 (Revised edition); *see* Exec. Order No. 12198, 45 Fed.Reg. 16932 (effective Sept. 1, 1980).

Reflecting the fact that *Jordan* involved a situation in which there had been compliance with the rights' warning requirement under Article 31 but noncompliance with the constitutionally-based, *Miranda–Tempia* counsel warning requirements, the 1980 amendments permitted impeachment of a testifying accused by an unwarned statement, but limited the provision to statements obtained in violation of the *Miranda–Tempia,* counsel warning requirements. Under the new rule, Mil. R.Evid. 304(b), a statement obtained after failure to provide the *Miranda–Tempia*

---

under *Miranda, see* 18 USC § 3501. The Supreme Court recently determined that the legislation was unconstitutional, relying in part on the doctrine of *stare decisis. Dickerson v. United States,* —— U.S. ——, ——, 120 S.Ct. 2326, 2336, 147 L.Ed.2d 405 (2000).

warning concerning the right to consult with counsel could be used "to impeach by contradiction the in-court testimony of the accused or the use of such statement in a later prosecution against the accused for perjury, false swearing, or the making of a false official statement." The Drafters' Analysis noted that this provision "adopts *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971) insofar as it would allow use for impeachment or at a later trial for perjury, false swearing, or the making of a false official statement, or statements taken in violation of the counsel warnings required under Rule 305(d)–(e)." The Analysis emphasized the limited scope of the new rule by adding: "A statement obtained in violation of Article 31(b), however, remains inadmissible for all purposes...." 1969 Manual, *supra* at A18–19.

In 1990, the Rule was amended further to permit limited use of a statement obtained in violation of the warning requirements of Article 31(b) and the related Military Rules of Evidence "to impeach by contradiction the in-court testimony of the accused or the use of such statement in a later prosecution against the accused for perjury, false swearing, or the making of a false official statement." The Drafters' Analysis cited *Harris* and our decision in *United States v. Williams*, 23 MJ 362 (1987). Furthermore, the Analysis, reflecting *Harris*, stated that "[a]n accused cannot pervert the procedural safeguards of Article 31(b) into a license to testify perjuriously in reliance on the Government's disability to challenge credibility utilizing the traditional truth-testing devices of the adversary process." The Analysis also noted that when there is a violation of the rules requiring cessation of questioning, "the deterrent effect of excluding the unlawfully obtained evidence is fully vindicated by preventing its use in the Government's case-in-chief, but permitting its collateral use to impeach an accused who testifies inconsistently or perjuriously." Manual for Courts–Martial, United States (1998 ed.) at A22–10.

The underlying theory of the 1990 change was that the accused is the gatekeeper as to admission of the unwarned statement and that only an inconsistent or perjurious statement by an accused who testifies at trial opens the gate. The accused, in deciding whether to testify, must consider whether he or she will thereby risk impeachment by contradiction or a "later prosecution." Mil. R.Evid. 304(b). The rule is based on the premise that Article 31(d) provides a shield when the prosecution seeks to use an unwarned statement as a sword against the accused, but does not shield an accused from cross-examination or a later prosecution when it is the accused, not the Government, who opens the door to questioning the veracity of his or her testimony at trial.[3] *Cf. Williams, supra* at 367–68 (precluding use of an unwarned statement to rebut evidence presented on behalf of an accused who has not opened the door through his or her in-court testimony).

Although in-court testimony is not at issue in the present case, we note that when an accused has opened the door to consideration of an unwarned statement through such testimony, reliance on Mil.R.Evid. 304(b) in a "later prosecution" may be viewed as consistent with our precedents regarding impact of actions by an accused in a judicial setting that affect the member's statutory rights. *See, e.g., United States v. Gammons*, 51 MJ 169, 183 (1999) (although the accused is the gatekeeper as to admissibility of records of prior non-judicial punishment for the same offenses, the Government may rely on such evidence if the accused has opened the door); *cf. United States v. Dowty*, 48 MJ 102, 110 (1998) (if the accused invokes a judicial proceeding under the Right to Financial Privacy

---

**3.** *Cf. United States v. Lewis*, 12 MJ 205, 208 (CMA 1982) (noting in *dicta* that a person who chooses to testify falsely rather than asserting the privilege against self-incrimination can be prosecuted for perjury regardless of whether the statement would be admissible with respect to another offense). The *dicta* in *Lewis* was confined to the example of an accused who opened the door by testifying. The actual holding in *Lewis*, which involved a charge of disrespect to a superior commissioned officer, is limited to permitting use of an unwarned statement to show the disrespect. The Court emphasized that the use with respect to that offense was "not in any way related to the truth, falsity, or reliability of its meaning." *Id.* at 208.

Act, which has the effect of delaying military justice proceedings, the Government can rely on the provisions of that Act tolling "any applicable statute of limitations").

Because appellant did not testify in the present case, the unwarned statements were not used for purposes of impeachment or otherwise to prove that he testified falsely at trial. The Government, however, asks us to apply Mil.R.Evid. 304(b) in a manner that would permit unwarned statements made during an investigation and obtained in violation of Article 31(b) to be introduced by the prosecution to prove essential elements of false official statements in its case-in-chief.

 We decline to interpret the Rule as applying to circumstances in which the accused has not opened the door to consideration of the unwarned statement by his or her in-court testimony. Applying the rule to a non-testifying accused, as urged by the Government, would place the Rule in direct conflict with Article 31(d). *See United States v. Price, supra.* In any such conflict, the Manual provision must yield to the statute. Article 36(a), UCMJ, 10 USC § 836(a) (the rules of evidence in the Manual for Courts-Martial may not be "contrary to or inconsistent with" the Code); *United States v. Lopez,* 35 MJ 35, 39 (CMA 1992) (under the "hierarchical sources of rights" applicable to the military justice system, federal statutes prevail over provisions of the Manual for Courts-Martial unless the Manual provision provides the servicemember with greater rights than the statute).

These considerations are particularly important in the absence of congressional action to overturn a precedent of this Court that is based upon the plain meaning of a statute and that is consistent with the context in which the statute was enacted. *See Connecticut National Bank v. Germain,* 503 U.S. 249, 253–54, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391, 393 (1992)("[I]n interpreting a statute a court should always turn first to

one, cardinal canon before all others. We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there.")

We are well aware of the corrosive impact of false statements on military effectiveness, and we have forthrightly rejected precedents from the civilian sector that would diminish the effectiveness of Article 107. *See United States v. Solis,* 46 MJ 31 (1997) (rejecting the so-called "exculpatory no" defense to false-statement prosecutions under Article 107).[4] In declining to apply civilian analogies to Article 107, *Solis* reflected our deference to the paramount role of Congress in shaping the military justice system. We emphasized that Congress, which created the military's false official statement statute embodied in Article 107, did not include an "exculpatory no" defense in Article 107 and that the responsibility for evaluating the desirability of including such a provision was within the province of the Legislative Branch, not this Court. *Id.* at 36.

The same considerations apply to the present case. The requirement to provide specific rights' warnings in Article 31(b) and the restriction on use of statements obtained in violation of those rights in Article 31(d) represent decisions made by Congress, not this Court. In the more than 40 years since *Price* was decided—including many years in which the Manual for Courts–Martial expressly prohibited use of unwarned statements in false statement prosecutions—Congress took no action to create an exception to Article 31(d) for false statement cases arising under Article 107. Congressional inaction, in such circumstances, must be given great weight "because the primary responsibility for overruling decisions on statutory construction is with Congress." *United States v. Gibson,* 43 MJ 343, 346 (1995). The decision as to whether it is necessary to reexamine the relationship between Article 31(d) and Article 107 to determine whether un-

---

4. We reached this decision notwithstanding the fact that a majority of the federal appellate courts that had addressed the issue at the time of our decision had endorsed the exculpatory-no doctrine with respect to a similar civilian offense.

*See* 46 MJ at 34 & n. 9. Subsequently, the Supreme Court disapproved use of the exculpatory-no defense in federal, civilian criminal trials. *Brogan v. United States,* 522 U.S. 398, 118 S.Ct. 805, 139 L.Ed.2d 830 (1998).

warned statements should be admissible in the case-in-chief against a non-testifying servicemember for making a false official statement rests with Congress, not this Court. *Cf.* 18 USC § 6002 (proscribing use of certain immunized testimony "in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order" to provide immunized testimony).

The dissent suggests that we should rely on analogies from civilian life to exempt Article 107 offenses from the coverage of Article 31(d). In some instances, consideration of criminal law developments in the civilian sector may be helpful when addressing aspects of the military justice system. However, when this Court assesses legislation created by Congress under its constitutional authority to "raise and support" the armed forces and "make Rules for the Government and Regulation" of those forces, we must be guided by the highest degree of deference to congressional action. U.S. Const., art. I, § 8, cl. 12–14; *Rostker v. Goldberg*, 453 U.S. 57, 101 S.Ct. 2646, 69 L.Ed.2d 478 (1981). So long as Congress does not act in disregard of the Constitution, we are obligated to respect congressional judgments as to the rights and obligations of members of the armed forces. *Id.* at 67, 101 S.Ct. 2646. Judicial deference to the balance drawn by Congress applies not only when Congress has provided servicemembers with rights less protective than those available to their civilian counterparts, but also when Congress has provided greater rights.

The dissent is based primarily upon cases from the civilian sector, none of which involve the factual predicate we have in this case— the prosecution for a false statement, made in the absence of required self-incrimination warnings, and admitted during the prosecution's case-in-chief. Instead, many of the cases cited in the dissent involve circumstances in which a person held a grant of immunity, testified, and then was prosecuted on the grounds that the testimony was false. Those cases are based on the premise that a person who knows that he or she has the protection against self-incrimination embodied in a grant of immunity cannot choose to

abuse the privilege through false testimony. This is in stark contrast to the present case, which involves a non-testifying person who was not provided with a statutorily required warning about self-incrimination protections. Most of the remaining cases cited in the dissent involve situations in which rights' warnings were not required as a matter of law, which mooted the question whether an illegally obtained statement could be used against the individual.

The dissent agrees that rights' warnings were required under Article 31(b), but declines to apply the statutorily mandated procedure for enforcing that requirement under Article 31(d), based on civilian precedent. Although we should give appropriate consideration to criminal law precedents, when we interpret the statutory provisions embodied in the Uniform Code of Military Justice, we must be particularly cautious in applying analogies from the civilian sector that involve judicial modifications of judicially-crafted doctrines, *see Dickerson*, 120 S.Ct. at 2335, or that involve interpretation of statutes that do not reflect the unique circumstances of military service. It is not our province to use such analogies to vitiate otherwise constitutional judgments by Congress about the rights and obligations of members of the armed forces.

### E. The Production Of The Divorce Decree

The production of the divorce decree, however, raises a separate issue— whether appellant had a Fifth Amendment or Art. 31(a) privilege as to the production of the divorce decree—which is distinct from the requirement to give the rights' advisement under Article 31(b). It is well "settled … that a person may be required to produce specific documents even though they contain incriminating assertions of fact or belief because the creation of those documents was not 'compelled' within the meaning of the privilege." *United States v. Hubbell*, —— U.S. ——, ——, 120 S.Ct. 2037, 2043, 147 L.Ed.2d 24 (2000). That proposition rests upon the legal distinction between the contents of the document and the testimonial significance of producing the

documents. *Id.* The contents of documents voluntarily prepared before the compelled production are not protected by the Fifth Amendment or Article 31(a) because the documents "could not be 'said to contain compelled testimonial evidence.'" *Id.* at 2043 (*quoting Fisher v. United States,* 425 U.S. 391, 409–10, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976)).

■ In this case, the record indicates that appellant voluntarily created a purported divorce decree before MSgt Vernoski requested its production. Appellant's personnel records reflected the fact that he had produced a divorce decree for purposes of changing spousal enrollment under DEERS well before MSgt Vernoski initiated his investigation. The DEERS form stated that appellant was divorced on September 14, 1994, the same date as listed on the purported divorce decree later provided to MSgt Vernoski. Additionally, the second Mrs. Swift told the first Mrs. Swift that she had the divorce decree in her possession during their first phone conversation, the day before MSgt Vernoski initiated his investigation. He also knew that the second Mrs. Swift told the first Mrs. Swift that the divorce decree indicated that she and appellant were divorced in September of 1994 and that the decree was filed in Pike County.[5] It is apparent that MSgt Vernoski's request for a divorce decree was made in the context of his understanding that appellant had provided a document purporting to be a divorce decree to the personnel office a month earlier.

In short, MSgt Veroski did not simply ask appellant to provide information about his marital status, but instead requested appellant to provide a document which appellant previously had produced at the personnel office to change appellant's DEERS form. Under these circumstances, appellant could not have objected to producing the divorce decree solely on the basis that the fraudulent contents were incriminating because MSgt Vernoski's request was based on facts indicating that the document, a divorce decree, had been created prior to the order to produce it. *See Fisher v. United States, supra.*

The Supreme Court also has stated "that the act of producing documents in response to a subpoena may have a compelled testimonial aspect" if "'the act of production' ... implicitly communicate[s] 'statements of fact.'" *Hubbell,* 120 S.Ct. at 2043; *see also United States v. Oxfort,* 44 MJ 337, 338 (1996) (citations omitted). Even if appellant's act of producing the divorce decree had testimonial aspects which arguably were incriminating, the production would fall within the "required records" exception to the Fifth Amendment and Article 31(a). *See Shapiro v. United States,* 335 U.S. 1, 68 S.Ct. 1375, 92 L.Ed. 1787 (1948); *see also Grosso v. United States,* 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906, (1968); *Oxfort,* 44 MJ at 339 (1996). If the Government requires documents to be kept for a legitimate administrative purpose, neither the content nor the act of production of these documents are protected by the Fifth Amendment. *See Shapiro,* 335 U.S. 1, 68 S.Ct. 1375, 92 L.Ed. 1787; *see also United States v. Sullivan,* 274 U.S. 259, 47 S.Ct. 607, 71 L.Ed. 1037 (1927) (rejecting Fifth Amendment objection to requirement to file income tax return).

■ To constitute "required records," the documents must satisfy the following test: (1) the requirement that they be kept "must be essentially regulatory"; (2) the records must be the "kind which the regulated party has customarily kept"; and (3) the records themselves must be either public documents or "have assumed 'public aspects' which render them at least analogous to public documents." 390 U.S. at 67–68, 88 S.Ct. 709; *see also In re John Doe,* 711 F.2d 1187 (2d Cir.1983).

The requirement to produce a divorce decree in order to establish and update military records supporting spousal eligibility for government benefits is regulatory; the divorce

---

5. Although not necessary to our decision on this issue, we note that this was the same date and location indicated in the divorce decree later provided by appellant to MSgt Vernoski. The record also indicates that the second Mrs. Swift provided a copy of what she believed was appellant's divorce decree to MSgt Vernoski the day after appellant gave the document in question. Upon comparison of the two documents, MSgt Vernoski concluded that they were identical.

decree is the type of record customarily kept by a party; and it is a public record. The personnel office's requirement for the servicemember to produce a copy of his divorce decree served a legitimate administrative purpose—to determine spousal eligibility for government benefits. Under these circumstances, the divorce decree was a "required record," the production of which falls within the exception to the Fifth Amendment and Article 31(a). *See United States v. Oxfort, supra.* Under the facts and circumstances of this case, even if MSgt Vernoski had provided the required Article 31(b) warnings, appellant could not have objected to an order to produce the divorce decree that he had previously provided to the personnel office. Because appellant had no Fifth Amendment or Article 31(a) privilege in either the content or the act of production of the divorce decree, we conclude that the military judge did not err in admitting the divorce decree into evidence.

### F. *Impact Of The Inadmissible Evidence*

The question remaining is whether the error in admitting the verbal statements obtained in violation of Article 31 had a prejudicial impact. Three aspects of the case potentially were affected by the illegally obtained statements: the bigamy conviction, two of the false official statement convictions, and the sentence.

#### 1. The Bigamy Conviction

In support of the bigamy specification, the prosecution produced evidence of two marriage certificates—one to the first Mrs. Swift dated August 28, 1990, and the other to the second Mrs. Swift dated January 1, 1996—and the fraudulent divorce decree. Additionally, the prosecution offered the testimony of the first Mrs. Swift, who testified that she knew of no divorce action by appellant.

The first Mrs. Swift also testified that she and appellant specifically decided not to obtain a divorce at the time of their separation because she would lose her military medical benefits and dependent identification card. She testified further that appellant, during a telephone conversation, had told her that he had a serious interest in another woman, and

she asked him whether he wanted a divorce. She testified that he had responded that they would just maintain the status quo and not obtain a divorce. This conversation took place in January 1996—after, unbeknownst to her, he already had married the second Mrs. Swift. In light of the significant evidence that was not derived from the unwarned statements, we are satisfied beyond a reasonable doubt that appellant was not prejudiced as to the bigamy conviction.

#### 2. The False Statement Convictions

In the first false statement specification, appellant was charged with making a false official statement when, in response to a question from MSgt Vernoski, he said that he was divorced from the first Mrs. Swift and that a named civilian attorney had represented him in the divorce proceeding. This specification was based upon appellant's verbal response to an unwarned inquiry. Without that evidence, there is no proof of an offense, and the specification must be dismissed.

In the second specification at issue, appellant was charged with making a false official statement when he presented to MSgt Vernoski "an official statement, to wit: a purported divorce decree, which document was totally false...." Unlike the first specification, the second false official statement specification was based upon evidence properly admitted against appellant. In addition to the document itself, the Government offered evidence that the divorce decree had never been filed at the Pike County Courthouse nor signed by an active Circuit Court Judge, as it purported. In light of the Government's evidence on this specification, we are satisfied that there was sufficient evidence to find appellant guilty of this specification without reliance upon any of appellant's unwarned statements.

#### 3. The Sentence

Even without the first false official statement offense, appellant remains convicted of making two separate false official statements; two specifications of writing bad checks; bigamy; and impeding an investigation. Appellant's sentence included a bad-

conduct discharge and reduction to the lowest enlisted grade, but did not include either confinement or forfeitures. In light of the remaining offenses and the evidence in this case, we are convinced beyond a reasonable doubt that the error with respect to the dismissed offense was not prejudicial as to the sentence.

## III. DECISION

The decision of the United States Air Force Court of Criminal Appeals is reversed as to specification 1 of Charge I. The finding of guilty as to that specification is set aside, and that specification is dismissed. In all other respects, the decision below is affirmed.

SULLIVAN, Judge (concurring in part and dissenting in part):

Appellant was a soldier with two wives, one of whom was bombarding his command with complaints about his suspected bigamy. His first sergeant (1st Sgt) had good reason to suspect these complaints were true when he called appellant into his office to hear "his side of the story." Unfortunately, he did not advise appellant of his rights under Article 31 with respect to this suspected criminal offense. This failure to warn was wrong as both the majority and I agree. *See generally United States v. Good*, 32 MJ 105, 108 (CMA 1991) (and case cited therein).[1]

Nevertheless, the 1ST Sgt (in pursuing his duties to clear up the inconsistencies in appellant's administrative records and in response to the complaints of appellant's first wife) proceeded to get appellant to explain his true marital status. The Army had a right to know since housing, medical, and other administrative benefits are dependent on the correct marital status of a servicemember. The record shows that appellant (in response to requests from the 1ST Sgt) told the 1ST Sgt that he was divorced from his first wife and gave the 1ST Sgt a false divorce decree. There was no evidence that appellant was coerced to lie to his 1ST Sgt or to give a false divorce decree to him. These acts form the basis for the two charges of giving false official statements.

Today, the majority sets aside appellant's conviction on one of these charges. In the process, *it effectively provides military suspects an unparalleled right to lie in their official statements to their military superiors or other government authorities.* In my view, such a holding directly contradicts existing precedent from our Court, an applicable Manual provision, and analogous Supreme Court, Court of Appeals and state court decisions. I dissent and would affirm appellant's convictions for making false official statements in violation of Article 107, Uniform Code of Military Justice, 10 USC § 907.

When one looks at this case from a distance, one could say that there is agreement by all the members of this Court on the requirement for warnings against self-incrimination. The different outcomes of the majority and my dissent are caused by the two different approaches to application of the exclusionary rule to the facts of this case. The majority takes a broad view of the exclusionary rule which allows appellant to escape any prosecution for the two false-official-statement charges. *But cf. United States v. Wong*, 431 U.S. 174, 97 S.Ct. 1823, 52 L.Ed.2d 231 (1977) (conviction for perjurious testimony sustained on basis of evidentiary use of unadvised but false statements); *United States v. Knox*, 396 U.S. 77, 90 S.Ct. 363, 24 L.Ed.2d 275 (1969) (conviction for making false official statement sustained regardless of validity of Government's request for information). My dissent applies a narrow, more conservative view of the exclusionary rule which would affirm his convictions for the two false-official-statement charges. *See Glickstein v. United States*, 222 U.S. 139, 32 S.Ct. 71, 56 L.Ed. 128 (1911) (holding that similarly worded exclusionary-rule statute should not be interpreted to permit the giving of false testimony with impunity).

---

1. The lead opinion in *United States v. Good*, 32 MJ 105, 108 (CMA 1991), has been repeatedly recognized as the law of this Court. *See United States v. Muirhead*, 51 MJ 94, 96 (1999); *United States v. Meeks*, 41 MJ 150, 161 (1994); *United States v. Davis*, 36 MJ 337, 340 (1993), *aff'd*, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994).

In my view, appellant had *the right to be warned* not to incriminate himself, but he had *no right to lie* in an official statement or to give a false divorce decree to his superiors in the U.S. Army. *See generally* 8 Wigmore, *Evidence* §§ 2270(2)(b) n.7 and 2282(1)(c) (McNaughton rev.1961). Neither the Constitution nor the Code gives him such a right to lie or deceive. *See Brogan v. United States,* 522 U.S. 398, 404, 118 S.Ct. 805, 139 L.Ed.2d 830 (1998) ("neither the text nor the spirit of the Fifth Amendment confers a privilege to lie"); *United States v. Lewis,* 12 MJ 205, 208 (CMA 1982) (following *United States v. Mandujano,* 425 U.S. 564, 96 S.Ct. 1768, 48 L.Ed.2d 212 (1976), and *Glickstein v. United States, supra,* in applying Article 31(d)). Moreover, I will not judicially create such a right of immunity.

The thrust of the majority's opinion is that the broad wording of Article 31(d) expresses the careful judgment of Congress that the servicemember should have an exclusionary rule affording greater protection than that afforded his civilian counterpart. 53 MJ at 445. The legislative history of this provision does not support such speculation by the majority. *Cf. United States v. Apfelbaum,* 445 U.S. 115, 121–123, 100 S.Ct. 948, 63 L.Ed.2d 250 (1980) (no speculation as to Congress' intent where it is inescapably supported by language and legislative history). Moreover, the majority's construction of Article 31(d) flouts "constitutional hornbook" law, well-settled by 1950, that prosecutions for perjury are permissible even if no perjury exception is provided in an immunity statute. *United States v. Housand,* 550 F.2d 818, 822 (2d Cir.1977) citing *United States v. Bryan,* 339 U.S. 323, 70 S.Ct. 724, 94 L.Ed. 884(1950); and *Heike v. United States,* 227 U.S. 131, 141, 33 S.Ct. 226, 57 L.Ed. 450 (1913) (Holmes, J., noting statutory proviso for perjury prosecution "added only from superfluous caution").

Instead, I adhere to the past decisions of this Court recognizing that Congress intended our exclusionary-rule remedy to be commensurate with the Fifth Amendment exclusionary rule, as traditionally delineated by the Supreme Court, unless expanded by the President in the Manual for Courts–Martial. *See United States v. Williams,* 23 MJ 362, 368 (CMA 1987); *United States v. Jordan,* 20 USCMA 614, 617, 44 CMR 44, 47 (1971); *United States v. Caiola,* 18 USCMA 336, 340–41, 40 CMR 48 (1969) (Darden, J., lead opinion). This Court's decision in *United States v. Lewis, supra,*[2] recognized this point and expressly permitted admission of evidence of unadvised statements to prove a subsequent disrespect offense. Moreover, the Supreme Court in *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), did not suggest that unwarned statements of a suspect could not be used in the prosecution's case-in-chief for any subsequent crimes. *See United States v. Wong, supra* (a post-*Harris* case refusing to apply Fifth Amendment exclusionary rule to case-in-chief evidence showing perjury before grand jury).

In my view, *Harris v. New York, supra,* does not support the broad "case-in-chief" exclusionary rule espoused by the majority in this case. In *Harris,* the precise question was whether an accused's pretrial statement, inadmissible under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), in the prosecution's case-in-chief *to prove the sale of heroin,* could nonetheless be used in rebuttal to impeach an accused's trial testimony as to that drug offense. The Supreme Court *approved* an impeachment exception to the federal exclusionary rule as a part of the *Miranda* decision. 401 U.S. at 224–25, 91 S.Ct. 643. However, it did not purport to limit exceptions to the *Miranda* exclusionary rule to the impeachment situation. In fact, it cited as authority, *United States v. Knox,* 396 U.S. 77, 90 S.Ct. 363, 24 L.Ed.2d 275 (1969), a case which recognized the traditional false-official-statement exception to the Fifth Amendment exclusionary rule.

---

**2.** In *United States v. Lewis,* 12 MJ 205, 208 (CMA 1982), a unanimous Court stated: "Under these circumstances, we hold that failure to give an Article 31 advisement does not bar admission into evidence of the accused's statement which, by its substance and context, constitutes a separate and distinct violation of the Uniform Code."

Furthermore, in *United States v. Mandujano*, 425 U.S. 564, 96 S.Ct. 1768, 48 L.Ed.2d 212 (1976), the Supreme Court subsequently approved the admission of similarly unwarned statements in the prosecution's case-in-chief for the offense of making a false statement to a grand jury. There, it approved its earlier decision in *Bryson v. United States*, 396 U.S. 64, 72, 90 S.Ct. 355, 24 L.Ed.2d 264 (1969) (prosecution for providing a false affidavit) and stated "similarly our cases have consistently—indeed without exception—allowed sanctions *for false statements or* perjury; they have done so even in instances where the perjurer complained that Government exceeded its constitutional powers in making the inquiry." 425 U.S. at 577, 96 S.Ct. 1768 (emphasis added); *see also United States v. Knox, supra*. Federal practice in this regard seems clear to me. *See United States v. Raftery*, 534 F.2d 854, 857 (9th Cir.1976), cited with approval in *United States v. Lopez–Martinez*, 725 F.2d 471, 476 (9th Cir.1984).

The majority broadly dismisses as inapplicable these Supreme Court cases (*Brogan, Wong, Knox, Bryson, Mandujano*, and *Glickstein*) as well as a decision of one of our fellow U.S. Courts of Appeals, *United States v. Veal*, 153 F.3d 1233, 1241 (11th Cir.1998) (holds that Supreme Court has not excluded from criminal liability false statements made to government agents or agencies in violation of the Fifth Amendment, whether made under oath), *cert. denied*, 526 U.S. 1147, 119 S.Ct. 2024, 143 L.Ed.2d 1035 (1999). In my view, however, although there may be some differences in terms of the nature of the Fifth Amendment violation in these cases, that does not alter applicability of their truthfulness rationale to our particular Article 31(d) question. The bottom line is that stated long ago in *Glickstein v. United States*, 222 U.S. at 142, 32 S.Ct. 71: "[I]mmunity afforded by the constitutional guaranty relates to the *past and does not endow the person who testifies with a license to commit perjury*." (Emphasis added.)

In my view, Congress was aware of this bedrock judicial principle of self-incrimination law when it enacted Article 31(d) and intended it to apply to servicemembers as well. *See generally Brogan v. United States, supra* at 406–07, 118 S.Ct. 805 (citing cases where "background interpretive principles of general application" considered in construing criminal statute); *see Hearings on H.R. 2498 Before a Subcomm. of the House Armed Services Comm., 81st Cong., 1st Sess.* 984 (1949) (Article 31 structured to generally conform with "the privilege against self-incrimination"), and *United States v. Aronson*, 8 USCMA 525, 529–30, 25 CMR 29, 33–34 (1957).

The majority further suggests that Mil. R.Evid. 304(b)(1) has been improperly urged by the Government in this case to permit use of the unadvised statements in a prosecution for making a false official statement. It notes language in the 1980 Drafters' Analysis suggesting that "a statement obtained in violation of article 31(b), however, remains inadmissible for all purposes" as supporting its view. I disagree.

Mil.R.Evid. 304(b)(1) (1990) states the contrary. It says:

(b) *Exceptions.*

(1) Where the statement is involuntary only in terms of noncompliance with the requirements of Mil.R.Evid. 305(c) or 305(f), or the requirements concerning counsel under Mil.R.Evid. 305(d), 305(e), and 305(g), *this rule does not prohibit* use of the statement to impeach by contradiction the in-court testimony of the accused or *the use of such statement in a later prosecution against the accused* for perjury, false swearing, *or the making of a false official statement.*

(Emphasis added.)

This language responded to this Court's previous decision in *United States v. Jordan, supra* at 617, 44 CMR at 47, which noted that the Manual exclusionary rule was broader than federal practice. The amended rule permits use of unadvised statements in the Government's case-in-chief in a false-official-statement prosecution as consistent with federal-exclusionary-rule practice. *See United States v. Wong* and *United States v. Knox*, both *supra*. Coincidentally, the Drafters' Analysis for this new rule no longer contains

the Article 31(b) language touted by the majority.

In sum, there is a basic difference between the majority's view and my view of this case. It centers on one of the core aspects of the Federal Exclusionary Rule. I believe Article 31 (like the Fifth Amendment) only applies to *past crimes*, *i.e.*, those committed before the interrogation where there were no self-incrimination warnings. The majority wants to ignore our Court's and federal civilian courts' case law to say that, if there were no warnings of self-incrimination, any soldier can then lie under oath in an interrogation (*i.e.*, commit a present crime). I don't think that the post-World War II Congress was ignorant of this distinction between "past" and "present" crimes when they passed Article 31. In my view, the majority is clearly wrong in believing that Congress gives immunity for any crime committed in an unwarned interrogation.

The majority apparently[3] returns to the out-dated, absolutist view of Article 31(d) espoused by this Court prior to the decision of the Supreme Court in *Harris v. New York, supra.. See United States v. Price,* 7 USCMA 590, 593, 23 CMR 54, 57 (1957). In doing so, it overrules, *sub silentio,* our subsequent decisions which have recognized *Har-*

*ris v. New York, supra,* and earlier Supreme Court Fifth Amendment exclusionary-rule cases as the guiding force for our Article 31(d) case law. *United States v. Lewis* and *United States v. Jordan,* both *supra.* It also breaks ranks with mainstream jurisprudence in state and lower federal courts. *See United States v. Veal, supra* (federal cases cited therein); *People v. Tomasello,* 21 N.Y.2d 143, 287 N.Y.S.2d 1, 234 N.E.2d 190 (1967); *Butterfield v. State,* 992 S.W.2d 448 (Tex.Crim. App.1999); *McGee v. State,* 105 Nev. 718, 782 P.2d 1329, 1331–33 (1989).

Finally, in my view, the majority essentially holds that Mil.R.Evid. 304(b)(1) is legally invalid because of Article 31(d). "Applying the rule to a non-testifying accused, as urged by the Government, would place the Rule in direct conflict with Article 31(d). In any such conflict the Manual provision must yield to the statute." 53 MJ at 451 (citation omitted). Supreme Court review of the propriety of such a holding would be most appropriate. *See United States v. Scheffer,* 523 U.S. 303, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998) (Supreme Court overturns decision of this Court that Mil.R.Evid. 707 prohibiting admission of polygraph evidence was unconstitutional).

---

**3.** The majority attempts to have it both ways. On the one hand, it asserts that there are no express exceptions to Article 31(d), in the Uniform Code of Military Justice, which permit use of this evidence in a false-official-statement prosecution. On the other hand, it asserts that evidence of unadvised statements may be used as impeachment evidence or to prosecute for perjury if an accused subsequently testifies falsely at a court-martial. Clearly, the majority's "gatekeeper" creation is not contained in the language of Article 31(d).