UNITED STATES, Appellee

v.

Alexander L. COHEN, Airman First Class
U.S. Air Force, Appellant

No. 04-0606

Crim. App. No. 34975

United States Court of Appeals for the Armed Forces

Argued October 12, 2005

Decided April 7, 2006

BAKER, J., delivered the opinion of the Court, in which GIERKE,
C.J., and CRAWFORD, EFFRON, and ERDMANN, JJ., joined.


Counsel


For Appellant: Captain David P. Bennett (argued); Colonel
Carlos L. McDade and Major Sandra J. Whittington (on brief);
Major Terry L. McElyea.

For Appellee: Major Michelle M. Lindo McCluer (argued);
Lieutenant Colonel Robert V. Combs and Lieutenant Colonel Gary
F. Spencer (on brief); Captain C. Taylor Smith.

Military Judge: Israel B. Willner


THIS OPINION IS SUBJECT TO REVISION BEFORE FINAL PUBLICATION.

United States v. Cohen, No. 04-0606/AF

Judge BAKER delivered the opinion of the Court. Appellant was tried by a general court-martial composed of officer members. In accordance with his pleas, he was convicted of two specifications of indecent acts in violation of Article 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 934 (2000). Contrary to his plea, he was convicted of indecent assault also in violation of Article 134, UCMJ.[1] The adjudged sentence included a dishonorable discharge, confinement for four years, forfeiture of all pay and allowances, and reduction to grade E-1. The convening authority approved three of the four years of confinement but otherwise approved the sentence as adjudged. The Air Force Court of Criminal Appeals affirmed. United States v. Cohen, No. ACM 34975, 2004 CCA LEXIS 130, 2004 WL 1238960 (A.F. Ct. Crim. App. May 18, 2004) (unpublished). Before this Court, Appellant challenges the military judge's failure to suppress statements he made to the Inspector General (IG) on the basis of the IG's failure to advise him of his rights pursuant to Article 31, UCMJ, 10 U.S.C. § 831 (2000).[2] Although we find that the IG should have given a rights warning, we conclude the error was harmless and affirm.

_____

[1] Appellant was acquitted of rape in violation of Article 120, UCMJ, 10 U.S.C. § 920 (2000), and fraudulent enlistment in violation of Article 83, UCMJ, 10 U.S.C. § 883 (2000).

[2] We granted review of the following issue:

## Background

On February 5, 2000, Appellant and four other individuals -- two females and two males -- all trainees at Goodfellow Air Force Base (AFB), Texas, drove to a concert in Abilene, Texas. During this trip, everyone except for Airman (Amn) W consumed large quantities of alcohol. After the concert, Appellant and his companions spent the night in a motel room in Abilene. While there, Appellant photographed himself digitally penetrating one of the female airmen, Amn M, who was passed out on a bed. He also photographed another airman having intercourse with Amn M while she was passed out on the bed.

Subsequent to these events, Appellant became concerned about the length of time it was taking to process his security clearance. Additionally, his command had denied a leave request to visit his ill father. Consequently, between February 23, 2000, and June 14, 2000, Appellant met several times with Lieutenant Colonel (Lt Col) Kluck, the IG for the 17th Training Wing, to discuss how best to resolve these issues. These meetings were initiated by Appellant and were conducted pursuant to the IG's authority to investigate complaints within the Air Force. Lt Col Kluck had at least eighteen years of previous

---

WHETHER THE MILITARY JUDGE ERRED WHEN HE DENIED APPELLANT'S MOTION TO SUPPRESS STATEMENTS HE MADE TO THE BASE INSPECTOR GENERAL.

experience as an Office of Special Investigation (OSI) investigator.

According to Lt Col Kluck "the Abilene incident was discussed when he . . . came in and spoke with me," on May 31, 2000. On a complaint registration form dated the same day, Appellant indicated that he had been charged with rape, but that the charge had been "dropped [until] further notice." Lt Col Kluck's notes accompanying this form indicate that "Cohen is being told by SJA [staff judge advocate] that he will be a witness in a trial [or an Article 32, UCMJ § 832 (2000), hearing] beginning 8 Jun 00. Cohen's attorney feels he won't be needed." Lt Col Kluck had a final meeting with Appellant on June 14, 2000, during which they again discussed the issues of Appellant's security clearance and his leave. During this meeting, Lt Col Kluck learned from Appellant that his attorney had indicated that Appellant "should be good to go on leave since he [will] not be needed for trial until mid - late July 00." During one or more of these meetings with Lt Col Kluck, Appellant described the incident in Abilene.

On the merits at Appellant's court-martial, Lt Col Kluck was allowed to testify over objection that Appellant had admitted to being present during the rape of Amn M, that he had photographed the rape of Amn M and that he had assisted in cleaning Amn M's clothing after the rape. During the

4

unsuccessful motion to suppress and on the merits Lt Col Kluck testified that he had been aware of Appellant's statement on the intake form regarding the rape charge, but had not administered warnings because Appellant had indicated to him that he was only a witness to the acts against Amn M. Specifically, Lt Col Kluck testified that while they were discussing the issue of leave, he asked Appellant whether there were any problems he should know about before he spoke with Appellant's command. Appellant responded that "he had been involved in an incident in the Abilene area." According to Lt Col Kluck, Appellant went on to describe the events of that evening, including the sexual activity between the drunk female airman, Amn M, and another male airman. However, Appellant told Lt Col Kluck that he was not a participant in such activity. When asked about whether Appellant mentioned anything about taking photographs of what occurred that night in Abilene, Lt Col Kluck responded that Appellant did tell him about taking the photographs. Lt Col Kluck further testified that he asked Appellant whether he was a participant, because, if he had been, "at that point, the interview would have changed a bit." Appellant responded, "no, he was simply a witness in this incident, by taking photographs," Lt Col Kluck testified.

On cross-examination, Appellant's civilian defense counsel asked Lt Col Kluck whether he "ever advise[d] [Appellant] of his

rights?" Lt Col Kluck responded, "No, I didn't. There was no reason for me to."

Defense counsel focused on the intake sheet dated May 31, 2000, and attempted to show that the IG should have been on notice that Appellant was a suspect because of the reference to the rape charge. That colloquy proceeded as follows:

Q. So, in fact, my client told you that he had been charged with rape, didn't he?

A. He said he'd been charged with rape.

Q. So, in that sense, he alerted you to the fact that he was facing charges?

A. No. I asked him -- I looked at this [form] and I said, "Are you being charged?" And, he said that he had been charged, that the charges were dropped, and he was now a witness in another case and he wasn't charged with anything. And that was confirmed when I talked to the JAG's office, that he was no longer being charged with anything. He was simply a witness in another case.

Satisfied with Appellant's response that he was not facing pending charges related to the rape of Amn M, Lt Col Kluck testified that he proceeded to obtain information from Appellant that he believed would aid him in resolving Appellant's leave problem. Defense counsel continued:

Q. Did you need that information from him about what happened that night [in Abilene] to be able to decide whether or not he should be given leave at that time?

A. I asked him what issues had been raised, what he'd been involved in, was there anything -- any negative behavior that he'd been involved with that would preclude him from going on leave, which is what I

6

> would need to know if I were going to talk to the
> squadron commander or the group commander to assist
> him in obtaining leave.

According to Lt Col Kluck, at this point Appellant described two unrelated incidents of sexual misconduct with high school girls in New York and Colorado and the events that had transpired in Abilene.[3] During further testimony on the motion to suppress, Lt Col Kluck stated that he may not have needed all the information elicited from Appellant to resolve the issue:

Q. All you needed to know in order to perform your duties as an IG resolving a leave complaint was whether or not he might be a witness in a proceeding where his presence at Goodfellow would be required that might interfere with him taking leave? That's all you needed to know, isn't it?

A. Yes. Sure.

Q. To perform your duties. You didn't have to know all the facts or details of whatever it was he might have witnessed in order to perform your duties?

A. Yes, it could be looked at that way.

Q. So, you could have resolved his complaint simply by knowing that he might be a witness in a proceeding and his presence might be required that would interfere with leave, right?

A. True.

In support of the motion to suppress, the defense argued that Lt Col Kluck was aware, at least by May 31, 2000, that Appellant had been previously charged with rape. As a result, defense counsel asserted, Lt Col Kluck was obligated to

7

administer Article 31 warnings before asking Appellant any questions related to the rape of Amn M. Absent such warnings, Appellant's incriminating statements to Lt Col Kluck were inadmissible, defense counsel argued. The military judge disagreed, made essential findings, and concluded that the IG had "no criminal investigator or disciplinary duties." In addition, the military judge found, among other things, that the accused stated that he was only a witness, that he took photographs of the sexual acts, and that he helped clean the alleged victim's clothes.

On appeal, Appellant maintains that under United States v. Duga, 10 M.J. 206 (C.M.A. 1981), warnings were required before Lt Col Kluck questioned Appellant because the IG was acting in his official capacity and should have reasonably suspected Appellant of potential UCMJ violations, primarily because Appellant had indicated on his intake form that he had been charged with rape.

The Government responds that Article 31 warnings were not required because even though Lt Col Kluck was acting in his official capacity, he was not questioning Appellant for a law enforcement or disciplinary reason. Furthermore, the Government contends, even assuming Article 31 warnings were required, Appellant suffered no prejudice from the admission of his

---

[3] The members were not present during this aspect of Lt Col Kluck's testimony.

United States v. Cohen, No. 04-0606/AF

statements to Lt Col Kluck.

The Court of Criminal Appeals held that Article 31 warnings were not required because the IG was not acting in a "law enforcement or disciplinary capacity." Cohen, 2003 CCA LEXIS 130, at *19, 2004 WL 1238960, at *7. The court also found that there was "no basis to conclude that the IG made promises of confidentiality such as would render the appellant's statements to him involuntary." Id. Finally, the court concluded that even if the military judge erred by admitting Appellant's statements, Appellant suffered no material prejudice because the evidence was sufficiently strong to convict him, even without the statements. Id. at *19-*20, 2004 WL 1238960, at *7.

## Discussion

"When there is a motion to suppress a statement on the ground that rights' warnings were not given, [this Court] review[s] the military judge's findings of fact on a clearly-erroneous standard, and . . . conclusions of law de novo." United States v. Swift, 53 M.J. 439, 446 (C.A.A.F. 2000); United States v. Ayala, 43 M.J. 296, 298 (C.A.A.F. 1995); see United States v. Moses, 45 M.J. 132, 135 (C.A.A.F. 1996).

Article 31(b) states:

No person subject to this chapter may interrogate, or request any statement from, an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which

9

he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

Article 31(b) contains four textual predicates. First, the article applies to persons subject to the UCMJ. Second and third, the article applies to interrogation or requests for any statements from "an accused or a person suspected of an offense." Fourth, the right extends to statements regarding the offense(s) of which the person questioned is accused or suspected.

As this Court first noted in United States v. Gibson, were these textual predicates applied literally, Article 31(b) would potentially have a comprehensive and unintended reach into all aspects of military life and mission. 3 C.M.A. 746, 752, 14 C.M.R. 164, 170 (1954). As a result, this Court has interpreted the second textual predicates -- interrogation and the taking of "any" statement -- in context, and in a manner consistent with Congress' intent that the article protect the constitutional right against self-incrimination. Id.; see also Duga, 10 M.J. at 208-10; Swift, 53 M.J. at 445 (discussing congressional intent with regard to Article 31).

To deal with the problem identified in Gibson, this Court decided numerous cases that sought to clarify what it meant to "interrogate, or request any statement from an accused or a person suspected of an offense." Article 31(b), UCMJ. From

10

these cases, a number of factors become important for the analysis, including the questioner's status and the military context in which the questioning occurs.

Where the questioner is performing a law enforcement or disciplinary investigation, for example, and the person questioned is suspected of an offense, then Article 31 warnings are required. Swift, 53 M.J. at 446-47. Whether the questioner should be considered to be performing such an investigation is determined by "'assessing all the facts and circumstances at the time of the interview to determine whether the military questioner was acting or could reasonably be considered to be acting in an official law-enforcement or disciplinary capacity.'" Id. at 446. (quoting United States v. Good, 32 M.J. 105, 108 (C.A.A.F. 2000)).

Conversely, where the questioner is not acting in a law enforcement or disciplinary capacity, rights warnings are generally not required, because "military persons not assigned to investigate offenses, do not ordinarily interrogate nor do they request statements from others accused or suspected of crime." United States v. Loukas, 29 M.J. 385, 388 (C.M.A. 1990) (quoting United States v. Gibson, 3 C.M.A. at 752, 14 C.M.R. at 170 (1954))(emphasis added by Loukas). Similarly, where the questioner is acting in an unofficial capacity and the person questioned does not perceive the questioning as more than casual

11

conversation warnings are not required.  Duga, 10 M.J. at 210.
Such an informal exchange would not implicate the interrogation
or statement predicate of Article 31(b) or Congress' concern
that, in the military context, junior enlisted personnel might
feel undue pressure to make incriminating statements.

This Court has also interpreted Article 31(b) in a manner
that recognizes the difference between questioning focused
solely on the accomplishment of an operational mission and
questioning to elicit information for use in disciplinary
proceedings.  Where there is a mixed purpose behind the
questioning, the matter must be resolved on a case-by-case
basis, looking at the totality of the circumstances, including
whether the questioning was "designed to evade the accused's
constitutional or codal rights."  United States v. Bradley, 51
M.J. 437, 441 (C.A.A.F. 1999).  In Bradley, for example, this
Court held that rights warnings were not required where the
commander was acting in an official capacity in "seeking
information needed for the proper review of appellant's security
clearance status," but was not conducting a criminal
investigation.  Id.  Similarly, in Loukas, warnings were not
required where an aircraft crew chief's questioning of a junior
member of the crew was not for the purposes of a law enforcement
or disciplinary investigation, but rather to fulfill his

legitimate operational responsibility to provide for the safety of his aircraft in flight. 29 M.J. at 387, 389.

At the same time, this Court has repeatedly cautioned that as a general matter, "questioning by a military superior in the chain of command 'will normally be presumed to be for disciplinary purposes.'" Swift, 53 M.J. at 446 (quoting Good, 32 M.J. at 108). Thus, in Swift, this Court held that the Government failed to rebut the strong presumption that Swift's interrogation by a military superior in his immediate chain of command was anything but a disciplinary investigation. 53 M.J. at 448. Likewise, in Good, this Court found that an investigator in the accused's chain of command should have given the accused his warnings upon their second meeting concerning missing checks. 32 M.J. at 109.

With respect to Article 31(b)'s third textual predicate, this Court applies an objective test. "Whether a person is a suspect is an objective question that 'is answered by considering all the facts and circumstances at the time of the interview to determine whether the military questioner believed or reasonably should have believed that the servicemember committed an offense.'" Swift, 53 M.J. at 446 (quoting Good, 32 M.J. at 108).

## Analysis

We agree with the parties that Lt Col Kluck was a "person subject" to the UCMJ. Lt Col Kluck was a commissioned officer serving on active duty as the Wing IG at Goodfellow AFB, Texas. In this position, Lt Col Kluck was superior in grade to Appellant, but he was not within Appellant's chain of command.

The parties do not agree as to whether Lt Col Kluck was engaged in a law enforcement or disciplinary function, and therefore do not agree as to whether his questioning of Appellant should be viewed as interrogation or the taking of "any statement" for the purposes of Article 31(b). Further, the parties disagree as to whether Lt Col Kluck should have reasonably believed Appellant was suspected of an offense arising out of the events in Abilene.

## Lt Col Kluck's Inquiry and Authority

The military judge found that Lt Col Kluck "had no criminal investigator or disciplinary duties." Further, the military judge concluded:

> The circumstances of this case easily overcome any
> presumption that the questioning by a superior ranking
> officer was for law enforcement or disciplinary purposes.
> The IG did not know or believe that the accused was a
> suspect in the alleged assault. He reasonably relied on
> the information provided to him by the accused, by the
> accused's unit, and by Major Ecton. His conclusion was
> reasonable under the facts and circumstances.

The lower court agreed, concluding:

14

> The Goodfellow AFB IG, to whom the appellant made the incriminating statements, was not acting in a law enforcement or disciplinary capacity, and he asked questions "limited to that required to fulfill his operational responsibilities."

Cohen, 2003 CCA LEXIS 130, at *19, 2004 WL 1238960, at *7 (quoting Loukas, 29 M.J. at 389). The record indicates that Appellant initiated the exchange with Lt Col Kluck. The record also demonstrates that Lt Col Kluck treated his investigation into Appellant's complaints as an administrative inquiry, and not as a criminal or disciplinary investigation. The denial of leave and delay in security clearance processing may have disciplinary roots, but they are not inherently criminal in nature. Rather, on their face, they relate to military morale and military mission and fall within Lt Col Kluck's mandate to investigate servicemember complaints administratively. Moreover, Lt Col Kluck perceived his function in this light, as evidenced by his treatment of Appellant as "a client" as well as his refusal to testify against Appellant until ordered to do so.

However, Lt Col Kluck's administrative focus in this case does not ultimately answer the critical question as to whether he was acting in an official law enforcement or disciplinary capacity while also performing his administrative duties. See Duga, 10 M.J. at 210. To answer that question we must consider Lt Col Kluck's authorities and responsibilities as specified in Dep't of the Air Force Instr., 90-301, Inspector General

Complaints (Aug. 12, 1999)[hereinafter 1999 AFI 90-301],[4] the regulation in effect at the time.

Air Force Inspectors General derive their authority from 10 U.S.C. 8014, 8020 (2000), as delegated, and applicable Department of the Air Force regulations. 2005 AFI 90-301; 1999 AFI 90-301. Installation IGs are responsible for implementing the IG Complaints Program and the Fraud, Waste, and Abuse (FWA) Program.

On the one hand, the responsibilities of the installation IG, as defined at that time, were primarily administrative and not disciplinary in nature. "The primary charge of the IG is to sustain a credible Air Force IG system by ensuring the existence of responsive complaint investigations, and FWA programs characterized by objectivity, integrity, and impartiality." 1999 AFI 90-301 para. 1.8.1. "IG investigations are administrative in nature and they are fact finding rather than judicial proceedings." Id. at para. 2.32. Moreover, complainants were generally offered confidentiality. "A complaint to an IG, or a complaint worked in IG channels, is confidential in nature and is privileged information." Id. at para. 1.37.1.1.[5]

---

[4] Note that this regulation. has been superseded by Dep't of the Air Force, Instr. 90-301 Inspector General Complaints Resolution, (Feb. 8, 2005) [hereinafter 2005 AFI 90-301].

On the other hand, the installation IG also had law enforcement and disciplinary responsibilities. For example, the confidentiality promised to complainants was subject to an express criminal exception: "EXCEPTION: IGs may turn over all IG case materials to the AFOSI [Air Force Office of Special Investigations] or SF [security forces] for criminal investigations if warranted, or higher level IG for investigation, as required." Id. at para. 1.37.5.1.2. Moreover, the general duties of the installation IG included the analysis of complaints to determine "[w]hat law, regulation, procedure, or policy was violated[.]" Id. at para. 2.13.1.3. As set out in 1999 AFI 90-301: "If a complainant alleges fraud, espionage, sabotage, treason, subversion, disloyal statements, disaffection, or other criminal offenses, IGs will immediately consult with the SJA and AFOSI office to determine whether the allegations should be referred to AFOSI channels for appropriate action, or stay within the IG complaint system." Id. at para. 2.4.3.

---

[5] It was on this basis that Lt Col Kluck initially declined to testify at Appellant's trial; however, he was eventually ordered to do so by the Inspector General of the Air Force. The record reflects that Lt Col Kluck acted in good faith in his dealings with Appellant and was motivated by a desire to protect the IG complaint mechanism. During the Article 39(a) UCMJ, 10 U.S.C. § 839(a) (2000), session on the suppression motion, Lt Col Kluck testified as follows:

> I somewhat take gross offense to the whole process -- the whole issue of having an IG testify against a client that comes in to talk with him, . . . . there's a privileged issue here. And, the IG, in this

Further, the instruction contemplates the possibility that IG investigations could transition into law enforcement or disciplinary investigations. Thus, among other things, the instruction provides the following:

> [Investigating officers are required to c]onsult in advance with the SJA about the need for and substance of Article 31 rights advisement.

> [MAJCOM, FOA and DRU IGs shall r]efer criminal allegations to AFOSI [Air Force Office of Special Investigations] or Security Forces (SF), as appropriate. If they decide not to investigate a criminal matter, obtain a documented transfer back to the IG and complete the appropriate category of investigation.

> Witnesses who are military members . . . may refuse to testify only if they believe they might incriminate themselves.

Id. at paras. 2.34.6, 1.12.3, 2.36.5.

Based on the foregoing, we conclude that the military judge's finding that Lt Col Kluck "had no criminal investigator or disciplinary duties" was clearly erroneous. Although Lt Col Kluck's responsibilities were primarily administrative, they were not exclusively so. Among other things, as the Wing IG, he was responsible for investigating wrongdoing, and reporting criminal violations to AFOSI. Significantly, the confidentiality he could offer to complainants did not extend to criminal conduct.

---

particular case, the Secretary of the Air Force IG, elected to waive that . . . . And, it, to me, is very very detrimental to the IG system.

The installation IG's disciplinary responsibility is further evidenced in the instruction's provision regarding rights advisement. Thus, if an IG, acting as an investigating officer (IO) on a complaint, "discovers information leading them [sic] to believe matters of a criminal nature have occurred and a witness or subject becomes a suspect, the IO must stop the interview, immediately consult with the Appointing Authority and the legal advisor, and (if allowed to proceed), advise the suspects of their rights." 1999 AFI 90-301 para. 2.39.[6] That Lt Col Kluck was aware of this requirement is evidenced by his testimony at trial that the interview "would have changed a bit" had Appellant admitted to participating in the nonconsensual sexual actions committed against Amn M.

In sum, not only did the military judge err when he found that Lt Col Kluck did not have law enforcement or disciplinary authority, but he also erred in his finding that Lt Col Kluck did not act in a way that implicated this authority when Appellant disclosed the events in Abilene in response to Lt Col's Kluck's questions.

Having concluded that Lt Col Kluck had disciplinary responsibility and that it was implicated in this case, we must now consider whether he should have reasonably suspected

---

[6] For active duty military personnel, this translates into a requirement to "advise them of their rights as specified under Article 31, UCMJ." 1999 AFI 90-301 para. 2.39.1.

19

Appellant of an offense at the outset of his inquiry, or whether there came a point during his inquiry when he should have suspected Appellant of an offense. If so, we must then determine whether, in context, a rights advisement was required.

Appellant's Status

Appellant argues that Lt Col Kluck should have considered him a suspect for the purposes of Article 31(b) at the outset of their meeting on May 31, 2000, based upon Appellant's complaint registration form. On it, Appellant wrote, "Legal charged me with Article 132? Rape . . . . The charge were [sic] dropped to future notice(?)" The Government responds that Lt Col Kluck took proper account of this statement by asking Appellant whether he was still subject to charges, to which Appellant responded that he was only a witness. The Government further argues that Lt Col Kluck reasonably relied on Appellant's response that he was no longer a suspect, only a witness.

Whether Lt Col Kluck was required, as a matter of law, to advise Appellant of his rights at the outset of the May 31 meeting is a close question. The following facts would support the contention that Lt Col Kluck was not required to do so. First, the IG's meeting with Appellant was conducted in the context of the IG Complaints Resolution program. See generally 1999 AFI 90-301. As a result, Lt Col Kluck's meetings with Appellant were not designed or intended to serve as a mechanism

20

to elicit statements of criminal culpability. Second, Lt Col Kluck interviewed Appellant about his clearance complaint in February without mentioning the incident earlier that month in Abilene and without the necessity of rights warnings. Thus, as far as Lt Col Kluck was concerned, at least half of Appellant's problem (security clearance) predated the incident in Abilene and could be addressed without implicating Article 31. Finally, Appellant advised the IG that he was only a potential witness involving the incident in Abilene. Lt Col Kluck did not have independent basis to conclude otherwise at the outset of the May 31 meeting. For these reasons, it was arguably reasonable for Lt Col Kluck to proceed with his inquiry into the clearance and leave complaints without first providing Appellant with an Article 31 rights advisement. Such inquiry would not necessarily have implicated the allegation of rape for which Appellant had been a suspect. Lt Col Kluck was arguably entitled, at least at the outset, to make such inquiry as he did of the Appellant to clarify his status as a witness and not a suspect. On the other hand, Appellant indicated on his form that he was charged with rape and that the charge might still be reinstated. Furthermore, Lt Col Kluck was aware that, since the last time they spoke, before there was any mention of Abilene, Appellant's request for leave had been denied. These two facts together are arguably enough to conclude that Lt Col Kluck

should have reasonably suspected Appellant of an offense, namely rape, when Appellant came to see him on May 31.

However, we need not resolve whether Appellant was entitled to a rights advisement at the outset of his May 31 meeting with Lt Col Kluck. For the reasons stated below, Appellant was clearly entitled to a rights warning at a later point in the conversation. Furthermore, up until that later point, Appellant had not made any admissions.

The complaint statement and Lt Col Kluck's subsequent conversations with the Deputy SJA should have placed him on notice that his discussions with Appellant might later trigger those sections of the IG instruction requiring rights warnings, AFOSI reporting, and potential waiver of complaint confidentiality. In this light, at the point during the May 31 interview between Lt Col Kluck and Appellant when the latter described his role in taking pictures of the incident in Abilene, rights warnings were required. At this point, Lt Col Kluck should have reasonably suspected Appellant of the offense of indecent acts, if not complicity in the rape itself. Under military case law, photographing or filming sexual acts is an offense punishable under Article 134 of the UCMJ. See, e.g., United States v. Lujan, 59 M.J. 23 (C.A.A.F. 2003) (noting appellant's guilty plea to committing an indecent act where he participated in videotaping the performance of numerous sexual

22

acts with a heavily intoxicated female soldier); United States v. Daye, 37 M.J. 714, 717-18 (A.F.C.M.R. 1993) (upholding appellant's conviction under Article 134 for surreptitiously videotaping himself engaged in consensual adulterous activity with another female solider); see also United States v. Izquierdo, 51 M.J. 421, 422-23 (C.A.A.F. 1999) (discussing the use of Article 134 to punish public sexual activity); United States v. Whitcomb, 34 M.J. 984, 987-88 (C.M.R. 1992) (upholding appellant's conviction under Article 134 for taking suggestive pictures of teenage girls).  It was these indecent acts with which Appellant was ultimately charged.  Further, Lt Col Kluck's testimony revealed that he was aware, at the time of the interview with Appellant, that the acts committed upon Amn M were not consensual.

In sum, although Lt Col Kluck was acting in furtherance of his administrative duties when he interviewed Appellant, his inquiry went beyond what was required to fulfill those duties. Moreover, during his inquiry Lt Col Kluck came under the purview of Article 31 by requesting statements from Appellant in a way that implicated the criminal investigative authority bestowed upon him by the applicable Air Force Instruction.

## Conclusion

We conclude that in accordance with Article 31(b), the applicable Air Force Instruction, and this Court's case law, Lt

Col Kluck had disciplinary responsibility that was implicated when Appellant described the incident in Abilene and he should reasonably have suspected Appellant of the offense of indecent acts at the point in the inquiry where Appellant disclosed his direct involvement in the incident in Abilene. Article 31 warnings were required when Appellant admitted to taking the photographs. As a result, the military judge erred in not suppressing any incriminating statements made after that point.[7]

## Prejudice

The question that remains is whether the military judge's error in admitting any unwarned statements made to Lt Col Kluck prejudiced Appellant in this case. See United States v. Kerr, 51 M.J. 401, 405 (C.A.A.F. 1999). We conclude that it did not. The prosecution presented the testimony of the other eyewitnesses to the events in the hotel room. These witnesses placed Appellant in the hotel room in Abilene. Most significantly, the prosecution presented the photographs taken by Appellant during the incident in Abilene. Moreover, although Appellant's statement that afterwards he helped clean Amn M's clothing was considered by the members on the rape specification, he was ultimately acquitted of the rape. As for his admissions to Lt Col Kluck regarding the taking of the

---

[7] Because we decide that Appellant was entitled to a warning under the rubric of Article 31(b), we do not address any additional arguments for such a

photographs, Appellant pleaded guilty to the indecent act of photographing the other airman's rape of Amn M.  Finally, none of what Appellant told Lt Col Kluck implicated Appellant in the indecent act <u>he</u> was convicted of committing against Amn M.

DECISION

For the reasons stated above, the decision of the United States Air Force Court of Criminal Appeals is affirmed.

---

warning under Article 31(d), UCMJ.