# UNITED STATES NAVY-MARINE CORPS
# COURT OF CRIMINAL APPEALS
# WASHINGTON, D.C.

**Before**
**THE COURT EN BANC**[1]

**UNITED STATES OF AMERICA**

v.

**MYLES R. SPURLING**
**PRIVATE FIRST CLASS (E-2), U.S. MARINE CORPS**

**NMCCA 201400124**
**SPECIAL COURT-MARTIAL**

**Sentence Adjudged:** 26 November 2013.
**Military Judge:** LtCol C.M. Greer, USMC.
**Convening Authority:** Commanding Officer, 10th Marine Regiment, 2d Marine Division, Camp Lejeune, NC.
**Staff Judge Advocate's Recommendation:** Maj J.N. Nelson, USMC.
**For Appellant:** Maj John Stephens, USMC.
**For Appellee:** Maj David Roberts, USMC; Maj Paul M. Ervasti, USMC.

**31 July 2015**

---
## OPINION OF THE COURT
---

**THIS OPINION DOES NOT SERVE AS BINDING PRECEDENT, BUT MAY BE CITED AS PERSUASIVE AUTHORITY UNDER NMCCA RULE OF PRACTICE AND PROCEDURE 18.2.**

KING, J., delivered the opinion of the court in which FISCHER, S.J., MARKS, J., and MILLER, J., concur. BRUBAKER, S.J., filed a concurring opinion joined by HOLIFIELD, J.. MITCHELL, C.J., filed a dissenting opinion.

---

[1] Judges Rugh and Palmer did not participate in the decision of this case.

KING, Judge:

A special court-martial, consisting of members with enlisted representation, convicted the appellant, contrary to his pleas, of one specification of making a false official statement, in violation of Article 107, Uniform Code of Military Justice.[2]  The members sentenced the appellant to reduction to pay grade E-1 and a bad-conduct discharge.  The convening authority approved the sentence as adjudged but, as a matter of clemency, suspended the bad-conduct discharge for a period of twelve months.

In his original appeal, the appellant raised three assignments of error (AOEs): (1) that the military judge committed plain error by failing to suppress the appellant's statements obtained in violation of Article 31(b), UCMJ, and the Fifth Amendment; (2) that trial defense counsel (TDC) were ineffective for failing to object to admission of his statements; and (3) that his sentence was inappropriately severe.

In our initial decision, *United States v. Spurling*, No. 201400124, 2014 CCA LEXIS 771, unpublished op. (N.M.Ct.Crim.App. 16 Oct 2014), we affirmed the findings of guilty and approved only so much of the sentence as provided for reduction to pay grade E-1.  The Court of Appeals for the Armed Forces (CAAF) set aside our decision and returned the case to the Judge Advocate General of the Navy for remand to this court for further consideration utilizing the standards of review set forth in *United States v. Jones*, 73 M.J. 357 (C.A.A.F. 2014) and *Strickland v. Washington*, 466 U.S. 668 (1994).  *See United States v. Spurling*, __ M.J. __, 2015 CAAF LEXIS 116 (C.A.A.F. Feb. 6, 2015) (summary disposition).  The case is now before us following that remand.

After carefully considering the record of trial, the submissions of the parties, and oral argument, we find merit in the appellant's second AOE.[3]

### Factual Background

A member of 10th Marine Regiment (10th Marines) the appellant was temporarily attached to augment the 1st Battalion, 10th Marines (1/10) during an Integrated Training Exercise (ITX)

---

[2] 10 U.S.C. § 907.

[3] Our resolution of AOE 2 moots AOEs 1 and 3.

in May 2013.  Personnel from both 10th Marines and 6th Marines participated in the ITX at Twentynine Palms, California.  The Marines were billeted at Camp Wilson, a small camp within the training area where personnel participating in ITX staged.  Camp Wilson included a recreational facility that served food and beer called the "Warrior Club".  Although Marines of legal drinking age could drink beer at the Warrior Club, the 1/10 commanding officer (CO) issued an order prohibiting all 1/10 personnel from consuming any alcohol while at ITX.  Consequently, 1/10 was a "dry" battalion for the duration of the exercise.

On 30 May 2013, the appellant went to the Warrior Club where he bought two cups of beer and sat down at a table with two other 1/10 Marines, Lance Corporal (LCpl) Mulhauser and LCpl Terry.  After he sat down, he offered one of his beers to the two Marines who responded that they were not permitted to drink.

Sitting several tables away playing cards were two noncommissioned officers (NCOs), Corporal (Cpl) Brooks and Sergeant (Sgt) Moyta.  Both were members of 1/10 and Cpl Brooks, like the appellant, was assigned to Headquarters Battery, 1/10.  Cpl Brooks recognized the appellant as he walked by holding the two cups of beer.  Cpl Brooks then told Sgt Moyta that "one of our . . . Headquarters Battery Marines is over here, and he's got two beers in front of him."[4]  Cpl Brooks, accompanied by Sgt Moyta, then approached the table where the appellant was sitting.  At trial, Cpl Brooks testified to the following exchange:

> A: [Cpl Brooks]:  . . . I talked to PFC Spurling and I said: "What do you have?"  He told me: "Beer."  Therefore confirming what I thought.  I said: "Okay.  Who are you with?"  He stated: "Regiment."  I said: "Okay.  What Regiment?"  And he just – he gave me a blank stare, I said: "Well, there's 6th Marine Regiment, there's 10th Marine Regiment," naming off the units that were . . . part of ITX.  At that time he said, "6th Marine Regiment."  I said: "Try again."
>
> Q: And why did you say "try again?"
> A: Because I knew that he was not being honest with me.

---

[4] *Id*. at 197.

Q: [D]id you know what regiment he was part of?
A: . . . I did at that time . . . .

Q: Then why did you ask him?
A: Well I asked him because I wanted him to tell me what he was doing and tell me what he was doing wrong.

Q: Okay.  So after he said "6th Marine Regiment," what did you say?
A: I said, "Try again."

Q: And what was his response?
A: A blank stare.  Then I said – I kind of looked at him – we stared at each other for a minute, he looked at me and said: "10th Marine Regiment."  I said: "Okay.  That means that you are attached to?"  Implying that he would finish the sentence and he just said "10th Marine Regiment."  And I said: "So, you're with 1/10 right?"  And he said: "Yes."  So, okay.  "So you are aware of the fact that our battalion is dry?"

Q: And what was his response . . . ?
A: At that time he said: "Yes." . . . . I said: "So why are you drinking?"  He said:  "My staff sergeant said I could."

. . . .

Q: Okay, after he told you that, what did you say?
A: I said: . . . "Who's your staff sergeant?"  He said: "Staff Sergeant Good."  I asked -- I looked at him and said: "Your staff sergeant verbally stated that you could consume alcohol regardless of the battalion policy?"  And he said: "Yes."[5]

Following this exchange, the appellant poured out the beer and left the Warrior Club.

Sgt Moyta testified that he went immediately to find Staff Sergeant (SSgt) Good.  After Sgt Moyta explained the incident, SSgt Good accompanied Sgt Moyta to the appellant's tent where SSgt Good confronted the appellant with both the drinking and

---

[5] *Id.* at 186-87.

using his name.  Although the appellant admitted to identifying SSgt Good as his platoon sergeant, he denied telling Cpl Brooks that SSgt Good authorized him to drink alcohol.[6]  SSgt Good then asked the appellant, "you know you weren't supposed to drink, right?"[7]  After the appellant responded in the affirmative, SSgt Good said, "you know there's going to be repercussions," and the appellant "acknowledged that as well."[8]  At no time did Cpl Brooks (at the Warrior Club) or SSgt Good (at the appellant's tent) inform the appellant of his rights under Article 31(b), UCMJ.

The appellant was charged with failing to obey the 1/10 CO's no-alcohol order and with making a false official statement by claiming that "Staff Sergeant Good said it was o.k. for me to drink alcohol."[9]  At trial, the appellant's statements to Cpl Brooks and SSgt Good were admitted without objection.  The members acquitted the appellant of failing to obey a lawful order, but convicted him of making a false official statement.

**Ineffective Assistance of Counsel**

On appeal, the appellant alleges that Cpl Brooks was required to provide him Article 31(b), UCMJ, rights warnings prior to questioning him, and that failing to do so rendered his statement inadmissible at trial.[10]  Concomitantly, the appellant alleges that TDC's failure to file a motion to suppress or object to admission of the appellant's statement amounted to ineffective assistance under *Strickland*.  The Government counters that the appellant has failed to establish either error or prejudice under *Strickland*."

This court ordered affidavits from TDC, wherein First Lieutenant (1stLt) B candidly concedes that she failed to "recognize the issue based on [her] lack of experience, the work load at the time, and never having argued an Article 31 issue" and that she "should have filed a motion to suppress."[11]  Her co-

---

[6] *Id*. at 226.

[7] *Id*. at 208.

[8] *Id*.

[9] Charge Sheet.

[10] Appellant's Brief of 29 Apr 2014 at 28-29.

[11] Government Response to Court Order filed on 23 Jul 2014, 1stLt B Affidavit at ¶ 7.

counsel, Captain (Capt) B largely concurs, stating that had the issue occurred to him "[he] would have proposed filing it."[12] Both TDC acknowledge that it was not until after participating in a post-trial debrief with the military judge, who asked whether they had filed a suppression motion, that they recognized the issue.[13]

## Discussion

An accused service member is guaranteed the right to effective assistance of counsel through the Sixth Amendment. *United States v. Gooch*, 69 M.J. 353, 361 (C.A.A.F. 2011). We analyze ineffective assistance of counsel claims under the two-prong test outlined in *Strickland*. In order to prove ineffective assistance of counsel, the appellant must show: (1) that his TDC's performance was deficient and (2) that the deficiency resulted in prejudice. *United States v. Scott*, 24 M.J. 186, 188 (C.M.A. 1987).

### A.  TDCs' Performance was Deficient

When reviewing an appellant's claim that his TDC's performance was ineffective, there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . ." *Id*. at 689. Since counsel are presumed competent, the appellant must rebut this presumption by showing specific errors that were unreasonable under prevailing professional norms. *Scott*, 24 M.J. at 188 (citing *United States v. Cronic*, 466 U.S. 648 (1984)).

A servicemember's protection against compulsory self-incrimination is a "fundamental right" protected by Article 31, UCMJ. *United States v. Mapes*, 59 M.J. 60, 65 (C.A.A.F. 2003). Although reasonable minds may differ on whether Article 31(b) applies to a given situation, there can be no determination one way or the other without first recognizing and analyzing the issue. Therefore, it is incumbent upon counsel to recognize issues relating to a servicemember's right against self-incrimination in the military context.

Here, TDC concede that they failed to recognize the issue until it was raised by the military judge during a post-trial

---

[12] Government Response to Court Order filed on 14 Aug 2014, Capt B Affidavit at ¶ 5.

[13] The trial judge did not preside over arraignment or pretrial motion hearings.

6

debrief.  While we recognize that TDCs' efforts lead to an acquittal on the orders violation charge, their failure to at least recognize and analyze the Article 31 issue at play with respect to Charge II fell below prevailing professional norms. As such, it was deficient.  *See Murray v. Carrier*, 477 U.S. 478, 496 (1986) (stating that the right to effective counsel "may in a particular case be violated by even an isolated error of counsel if that error is sufficiently egregious and prejudicial" (citing *Cronic*, 466 U.S. at 657, n.20 and *Strickland*, 466 U.S. at 693-96).  Neither "inexperience" nor "workload" can justify such a deficiency.

## B.  Prejudice

"'[W]hen a claim of ineffective assistance of counsel is premised on counsel's failure to make a motion to suppress evidence, an appellant must show that there is a reasonable probability that such a motion would have been meritorious.'" *United States v. Jameson*, 65 M.J. 160, 163-64 (C.A.A.F. 2007) (quoting *United States v. McConnell*, 55 M.J. 479, 482 (C.A.A.F. 2001).  In this regard, the term "meritorious" is synonymous with "successful."  *Id.* at 164 (decisional issue is whether the appellant has shown a reasonable probability that "his counsel would have been *successful* if he had filed a timely motion . . ." (Emphasis added)).

"A defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case," however, "the appropriate test for prejudice . . . [is whether] there is a reasonable probability that, but for the [deficiency] the result of the proceeding would have been different." *Strickland*, 466 U.S. at 693-94.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome" *Strickland*, 466 U.S. at 694.  To determine whether there is a reasonable probability that a suppression motion would have been successful, it is necessary to consider the merits of the Article 31(b) issue.

## Article 31(b)

Article 31(b), UCMJ provides: "No person subject to this chapter may interrogate, or request any statement from . . . a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used against him in a trial by court-martial."

7

Congress passed Article 31(b) "to provide servicepersons with a protection . . . deemed necessarybecause of subtle pressures which existed in military society." *Jones*, 73 M.J. at 360 (internal quotation marks and citation omitted).  Our superior court has held that, "[c]areful consideration of the history of the requirement of warning, compels a conclusion that its purpose is to avoid impairment of the constitutional guarantee against compulsory self-incrimination. . . [a] person subjected to these pressures may rightly be regarded as deprived of his freedom to answer or to remain silent." *United States v. Duga*, 10 M.J. 206, 209 (C.M.A. 1981), *overruled in part by Jones*, 73 M.J. at 362.  These pressures are created when "military rank, duty, or other similar relationship," might cause "subtle pressure on a suspect to respond to an inquiry." *United States v. Price*, 44 M.J. 430, 432 (C.A.A.F. 1996) (citing *United States v. Gibson,* 14 C.M.R. 164 (C.M.A. 1954)).  In fact, the Court of Military Appeals has held that, "[b]ecause of the effect of superior rank or official position upon one subject to military law, the mere asking of a question under certain circumstances is the equivalent of a command." *Duga,* 10 M.J. at 209).  As a result, our jurisprudence has evolved to the point where any questioning of a suspect by a military superior in his immediate chain of command will create a "strong presumption" that Article 31(b) applies.  *United States v. Swift*, 53 M.J. 439,  448 (C.A.A.F. 2000) (citing *United States v. Good*, 32 M.J. 105, 108 (C.M.A. 1991)).

However, the CAAF has also expressed concern that a literal application of Article 31 would "potentially have a comprehensive and unintended reach into all aspects of military life and mission." *United States v. Cohen*, 63 M.J. 45, 49 (C.A.A.F. 2006) (discussing *Gibson, 14 C.M.R. at 170*).  Therefore, that court narrowed the aperture by declaring that Article 31(b) rights warnings are required only if: (1) the person being interrogated is a suspect at the time of questioning, and (2) the person conducting the questioning is, or could reasonably be considered to be acting, in an official law enforcement or disciplinary investigation or inquiry.  *Swift*, 53 M.J. at 446.

## A.  Suspect

Whether a person is a suspect is a question that "is answered by considering all the facts and circumstances at the time of the interview to determine whether the military questioner believed or reasonably should have believed that the

8

servicemember questioned committed an offense." *Good*, 32 M.J. at 108 (citations omitted). *See also Jones*, 73 M.J. at 361.

Cpl Brooks testified that he knew the appellant was a member of 1/10; that he knew of the order prohibiting members of 1/10 from consuming alcohol while at the ITX; and that he saw the appellant at the ITX with two cups of beer in his hand. Cpl Brooks testified that, upon seeing the appellant with the beer, he became suspicious that the appellant was violating a lawful order. Under the totality of the circumstances, and considering the "relatively low quantum of evidence required to treat an individual as a suspect," *Swift*, 53 M.J. at 447, we have little difficulty concluding that Cpl Brooks believed that the appellant had committed an offense.

## B. Disciplinary Capacity

On this second requirement, Article 31(b) warnings must be provided to a suspect if "the person conducting the questioning is participating in an official law enforcement or disciplinary investigation or inquiry," *id*. at 446, as opposed to having "a personal motivation for the inquiry," *e.g. Jones*, 73 M.J. at 361, or an administrative or operational purpose, *e.g. Cohen*, 63 M.J. at 51.

To make this determination, we must examine all "the facts and circumstances at the time of the interview to determine whether [Cpl Brooks] was acting or could reasonably be considered to be acting in an official law-enforcement or disciplinary capacity." *Swift*, 53 M.J. at 446 (internal quotation marks and citations omitted). Whether Cpl Brooks could reasonably be considered to be acting in a disciplinary capacity is "judged by reference to 'a reasonable man in [the appellant's] position.'" *Jones*, 73 M.J. at 362 (quoting *Good*, 32 M.J. at 108 n.2).

We begin by recognizing that not every questioning of a servicemember who might reasonably be considered a "suspect" will invoke the requirements of Article 31(b). Indeed, mindful of the "unintended reach" warned of by the CAAF in *Cohen,* our precedent provides several examples of "official" but "non-disciplinary" inquiries: a medical officer who asks questions for the purpose of diagnosis is acting in an official yet non-disciplinary capacity (*United States v. Fisher*, 44 C.M.R. 277, 278-79 (C.M.A. 1972)); a commander who asks questions for the operational purpose of determining whether to terminate a service member's security clearance is acting in an official yet

9

non-disciplinary capacity (*United States v. Bradley*, 51 M.J. 437, 441 (C.A.A.F. 1999); a crew chief who asks questions for the safety-related purpose of determining whether a crew member's erratic behavior during a flight is due to drug use is acting in an official yet non-disciplinary capacity (*United States v. Loukas*, 29 M.J. 385, 387 (C.M.A. 1990)), and so on.

However, the facts of this case are not analogous to any of those cases, for there was neither an operational nor a safety-related purpose behind Cpl Brooks' questioning of the appellant. Rather, Cpl Brooks testified, "I asked him because I wanted him to tell me what he was doing and tell me what he was doing wrong."[14]  On cross examination, Cpl Brooks elaborated:

> A: I saw him sit down with two beers in his hand, ma'am.
>
> . . . .
>
> Q: And in your mind did you think there's a problem?
> A: Yes, ma'am.
>
> Q: Why did you think there was a problem?
> A: It's a violation of the rules.
>
> . . . .
>
> Q: Okay. And rules are rules; right?
> A: Rules are rules, yes, ma'am.
>
> Q: And you don't want to tolerate that, anyone breaking the rules; right?
> A: No, ma'am.
>
> Q: Okay. And so in order to make sure that good order and discipline was followed you went over there and you wanted to make sure it was corrected; right?
> A: Yes, ma'am.[15]

Under these facts, it is clear that Cpl Brooks was not acting in an operational, safety, or personal capacity. Instead, he saw a crime being committed and he questioned the one he suspected of committing it.  While the dissent classifies

---

[14] Record at 187.

[15] *Id.* at 197-98.

this questioning as "informal" and only an attempt to "correct this junior Marine's deficient behavior," it is at least as reasonable to conclude that Cpl Brooks' intended to enforce compliance with the order the appellant was violating and then ensure that such violation was reported to the appellant's immediate superior for action.

This conclusion is reasonable given the CO's concern regarding 1/10 Marines consuming alcohol during the ITX.  The CO testified that, "we were going to focus on training . . . on putting rounds down range safely and accurately."[16]  The no-alcohol consumption order was "a matter of safety and trying to keep all hands focused on the mission[.]"[17]  The CO also announced at staff meetings and battalion all-hands formations that he would have a "zero tolerance" policy for consuming alcohol.[18]  Thereafter, and prior to the appellant consuming alcohol, at least one other Battalion Marine violated the order and received nonjudicial punishment (NJP) in a manner that "was very evident" to the rest of the battalion.[19]

Considering the importance of the no-alcohol consumption policy to the command, it is reasonable to conclude that Cpl Brooks, who knew of the CO's decision to take others who previously violated the no-alcohol policy to NJP, would not have opted to resolve this open violation on his own, but rather would have forwarded the information up the chain of command for a decision on whether to discipline the appellant.  This reasonable conclusion strengthens the probability that Cpl Brooks was acting in a disciplinary capacity.

That "a reasonable man in the appellant's position" would have concluded that Cpl Brooks was acting in a disciplinary capacity is also probable.  Again, the evidence indicates that it was well-known in the Battalion that those who violated the no-drinking order received NJP, an inference that is reinforced by the appellant's conversation with SSgt Good, wherein the

---

[16] *Id.* at 160.

[17] *Id.*

[18] *Id*. at 159.

[19] *Id*. at 164.  Cpl Brooks testified that "[p]retty much everybody knew that the other Marines had got in trouble for drinking."  *Id*. at 188.  SSgt Good testified "[a] few incidents where Marines got NJP'd for drinking [in violation of the no-drinking policy] was brought up there in the formations."  *Id*. at 216.

appellant acknowledges that there were "going to be repercussions" for his violation of the no-drinking order.[20]  A reasonable interpretation of this evidence is that a reasonable person in the appellant's position knew that violations of the CO's order to abstain from alcohol were not likely to be resolved with simple informal "corrections."

Like the concurring opinion, we are mindful of the dissent's concern that an overly-strict application of Article 31(b) might result in "prohibit[ing] superiors from lawfully inquiring into or correcting deficient behavior in a subordinate without first issuing an Article 31(b) rights advisement." However, the dissent's opinion is founded upon the conclusion that the interaction between Cpl Brooks and the appellant was not "disciplinary" but merely a "teachable moment" or simply "informal counseling."  While we allow such a conclusion may be true, we also recognize that it may not.  We reiterate that we do not know the answer to that critical question because the issue was not raised and litigated at trial.

To be clear, we do not conclude that Cpl Brooks necessarily had a duty to warn the appellant of his rights under Article 31(b), nor do we hold as a matter of law that the appellant would have been successful had the motion been litigated. Instead, we find that a motion to suppress this case-dispositive evidence had a reasonable probability of success and therefore TDCs' failure to litigate the issue is "sufficient to undermine [our] confidence in the outcome" of this court-martial. *Strickland*, 466 U.S. at 694.

### Conclusion

The finding of guilty and the sentence are set aside.  The record is returned to the Judge Advocate General for remand to an appropriate convening authority with a rehearing authorized.

Senior Judge FISCHER, Judge MARKS, and Judge MILLER concur.

BRUBAKER, Senior Judge (concurring):

I agree that applying the proper legal standards, as clarified by our superior court, the appellant has met his burden of demonstrating both prongs of the *Strickland* test for ineffective assistance of counsel, *Strickland v. Washington*, 446

---

[20] *Id.*

12

U.S. 668, 694 (1984), and accordingly concur in the result. I write separately to clarify my reasoning in reaching this conclusion and out of a deep concern that this opinion not be misconstrued to give Article 31, UCMJ, the "comprehensive and unintended reach into all aspects of military life and mission" warned of in *United States v. Cohen,* 63 M.J. 45, 49 (C.A.A.F. 2006) (citation omitted).

Noncommissioned officers (NCOs) on a daily basis ensure compliance with standards, regulations, and norms. That is what they are expected and required to do, and it is not an exaggeration to say that a unit's effectiveness hinges on its NCOs' ability and willingness to perform this duty——hence their moniker as the "backbone of the Marine Corps." Technically, every time an NCO observes what he suspects to be noncompliance and approaches a Marine to correct it, the noncompliant Marine is a "suspect" within a literal meaning of Article 31. But it would be absurd indeed if Article 31 were read in a way to impose on every NCO the statutory duty to provide rights warnings every time before asking a Marine why he is a few minutes late for formation, or is not in the uniform of the day, or failed to render a salute to a passing officer.

There can be little doubt Corporal Brooks suspected the appellant was not in compliance with an order and that his purpose was to ensure good order and discipline. But this much is true every time an NCO performs his daily task of enforcing standards and is a different question than whether he was acting in a disciplinary capacity such as to trigger Article 31 requirements. *See Cohen*, 63 M.J. at 50 (interpreting Article 31(b) in a manner that "recognizes the difference between questioning focused solely on the accomplishment of an operational mission and questioning to elicit information for use in disciplinary proceedings.").

Indeed this case is, in my view, close because the record as developed does not make clear whether, subjectively and objectively, Corporal Brooks was acting with an administrative purpose when questioning the appellant——that is, with the purpose of taking *administrative* measures to ensure the appellant was aware of and complying with the order not to drink——or was eliciting information for use in disciplinary proceedings. *Id.*

The dissent is correct that no additional facts have come before the court to cause a change of position. I have changed my position from the original decision not because I am now factually persuaded that Corporal Brooks *was* acting with a disciplinary purpose, but because, having received course

13

correction on applicable legal standards from our superior court, I find that had the defense raised the admissibility of the statements to Corporal Brooks as they should have, there was a *reasonable probability* of a legally correct finding that Corporal Brooks was acting or reasonably could be considered to have been acting in such a capacity. I find the probability to be well beyond conjecture or speculation and sufficiently likely as to undermine my confidence in the outcome of the trial——which is all that *Strickland* demands. *Strickland*, 446 U.S. at 694. Accordingly, I concur in the result.

Judge HOLIFIELD joins.


MITCHELL, Chief Judge (dissenting):

In the original *en banc* opinion of this court, the majority and the minority were in agreement that Corporal (Cpl) Brooks intended to correct the appellant for violating the battalion commander's order not to consume alcohol during the Integrated Training Exercise (ITX), and consequently, that Cpl Brooks was not acting in a law enforcement capacity when he confronted the appellant.[1] Both the majority and the minority opinions also were in agreement that any chance of success on the motion to suppress the statement the appellant made to Cpl Brooks hinged on whether Cpl Brooks was acting, or could reasonably be considered to be acting, in a disciplinary capacity. The former majority, of which I was a part, specifically opined that, based on the totality of the circumstances, the appellant faced several significant obstacles in meeting this challenge to include, *inter alia*, Cpl Brooks' own testimony in which he described his intent as to "fix" or "correct" this Marine, making his actions administrative in nature. Accordingly, we found that the appellant failed to carry his burden of demonstrating prejudice within the meaning of *Strickland v. Washington*, 446 U.S. 668 (1984). Upon reevaluation, no additional facts have been put before the court that would imply that Cpl Brooks had any illicit motive in confronting the appellant, or to give us pause to alter our original position. That being said, I now find myself standing alone in dissent.

In a summary disposition, the Court of Appeals for the Armed Forces (CAAF) reversed this court's original decision, stating that the majority, in its review of the facts and

---

[1] There is nothing in the record to suggest that Cpl Brooks was acting in an official or law enforcement capacity. We need not analyze this aspect of Article 31(b), UCMJ.

14

circumstances to determine whether a motion to suppress would have been meritorious, relied on the subjective beliefs and opinions of the questioner and third-parties in assessing whether the appellant faced questioning from an individual in an official capacity or for disciplinary purposes vice the objective standard set out in *United States v. Jones*, 73 M.J. 357, 362 (C.A.A.F. 2014).  The CAAF also stated that this court correctly cited the "reasonable probability" of success standard to be applied, but that we erroneously equated that standard with a preponderance of the evidence standard to resolve the ineffective assistance of counsel question.[2]

## Ineffective Assistance of Counsel

Ineffective assistance of counsel under *Strickland* requires a two-fold examination into: (1) the deficiency of trial counsel's performance; and (2) whether the deficiency resulted in prejudice. 466 U.S. at 692; *see also United States v. Garcia*, 59 M.J. 447, 450 (C.A.A.F. 2004).

While I am cognizant of the fact that this is an issue of ineffective assistance of counsel vice a question about the application of Article 31(b), the two matters are inextricably linked.  Showing that counsel's deficiencies were prejudicial to the appellant (i.e., that certain action would have had a substantial likelihood of changing the outcome) is predicated upon the probability of success of the motion to suppress, which, in turn, rests on how the law is decided regarding the potential Article 31(b) violation.  It boils down to two questions: (1) what does "disciplinary status" mean with regard to Article 31(b); and (2) on a continuum measuring the probability of success - with wholly frivolous at one end and a preponderance of the evidence at the other — where does "a reasonable probability of success" lie?

Article 31(b) Protections

It is well-established that the military environment is different than the civilian context, which is why Article 31(b) offers different rights protections than those articulated under

---

[2] The actual language of the original majority opinion, citing language from Supreme Court case law amplifying the "reasonable probability" standard set forth in *Strickland*, stated: "Although the standard of 'reasonable probability' may suffer from a lack of granularity, any difference between this standard and the more familiar standard of preponderance of evidence of the evidence 'is slight and matters "only in the rarest case.'" *United States v. Spurling,* No. 201400124, 2014 CCA Lexis 771 at *9 n.18, unpublished op. (N.M.Ct.Crim.App. 16 Oct 2014) (citing *Harrington v. Richter*, 562 U.S. 86 (2011) (additional citation omitted)).

*Miranda v. Arizona*, 384 U.S. 436 (1966).  The intent was to avoid impairing the constitutional guarantee against compulsory self-incrimination that might occur when members are questioned by superiors, law enforcement, or any other person in authority given the rank structure of the military. *See United States v. Duga*, 10 M.J. 206, 209 (C.M.A. 1981).  I cannot fathom that the framers of Article 31(b) crafted the rule intending to prohibit superiors from lawfully inquiring into or correcting deficient behavior in a subordinate without first issuing an Article 31(b) rights advisement.

Consider the following scenario.  A Sailor or Marine is late to formation.  A superior in the chain of command, intending to determine whether or not the tardiness was the result of deficient behavior and correct any deficiency with extra military instruction, consequently questions the member about his absence.  The member, when questioned, chooses to lie – arguably a much greater infraction under the UCMJ.  The majority's opinion seems to suggest that correcting conduct that is conceivably punishable under the UCMJ requires the reading of Article 31(b) rights, or else the member could be absolved of any culpability for his untruthful statements through a motion to suppress the statement for lack of notice against self-incrimination.  Such a proposition does not comport with military culture as it would bind the disciplinary authority of the officers and noncommissioned officers whose responsibility it is to maintain good order and discipline within the unit.

Disciplinary Status of Cpl Brooks

As in the original majority and minority opinions, we are all still in agreement that any chance of success on a motion to suppress the appellant's statement turns on whether Cpl Brooks was either acting in a disciplinary status or could reasonably be considered to be acting in a disciplinary capacity.  This is determined by "assessing all the facts and circumstances at the time of the interview to determine whether the military questioner was acting or could reasonably be considered acting in an official or law enforcement or disciplinary capacity." *Cohen*, 63 M.J. at 49 (quoting *United States v. Swift,* 53 M.J. 439, 446 (C.A.A.F. 2000) (additional citation omitted)); see also *Jones,* 73 M.J. at 361.

In assessing all the pertinent facts, I first note that the setting was the Warrior Club, a recreational facility where the Marines assigned to the ITX, in the words of one lance corporal, could "get [their] free time on."[3]  There was nothing

---

[3] Record at 171.

intimidating about the venue in which this conversation took place.  We next note that Cpl Brooks was not the appellant's senior noncommissioned officer, as he was not in the appellant's direct chain of command.  While in *Swift* there is a presumption that the person acted in a disciplinary capacity if the military questioner was in the direct chain of command - such is not the case here.  The pertinent part of the record, and the facts before this court, then and now, support Cpl Brooks' contention that he informally approached the appellant with the intent to counsel him and correct this junior Marine's deficient behavior.

Finally, the manner and tone in which Cpl Brooks approached the appellant gives credence to the informal nature of the query.  Cpl Brooks did not need to approach the appellant and question him about consuming alcohol to report the apparent violation up the chain of command.  He and Sergeant (Sgt) Moyta, along with others in the Warrior Club, had already witnessed the violation as the appellant was drinking openly in front of others.  Cpl Brooks approached the appellant in a teachable moment and initially asked him if he was part of 1/10 in order to allow the appellant the opportunity to acknowledge his error and correct his behavior.  Cpl Brooks and Sgt Moyta testified that the appellant's attitude during the conversation suggested no more than informal counseling as the appellant rolled his eyes and acted in a disrespectful manner.[4]  While not dispositive, a casual bystander, Lance Corporal Mulhauser, also described the conversation as informal counseling.  On this record, the appellant would be hard-pressed to show that Cpl Brooks was either acting in a disciplinary status or could reasonably be considered to be acting in a disciplinary capacity.  These facts present a significant challenge to the appellant's burden to show prejudice.

While I am hesitant to speculate, I am left to wonder what the result would have been had the appellant acknowledged his mistake, apologized, and discarded the beer.[5]  I, in all

---

[4] *Id*. at 188, 206.

[5] The majority seems to put a lot of stock in the fact that at least one Marine was punished at nonjudicial punishment (NJP) for consuming alcohol during this exercise.  The majority opinion suggests because this Marine was punished at NJP, it was a foregone conclusion that Cpl Brooks was going to report this incident up the chain of command thereby buttressing the argument that he was acting in a disciplinary status.  I note, however, that there is no indication in the record or otherwise detailing the facts of the alcohol related incident involving the other Marine.  There is nothing in Cpl Brooks' testimony that leads me to believe that he was doing more than correcting deficient behavior as he stated on the record.  Even if Cpl Brooks realized that there would probably be disciplinary action to follow, there is no

17

likelihood, would have no need to write this dissent as the case probably would not be before this court.

Sufficiency of the Record

I also note that the majority opinion indicates that because this issue was not identified, raised, and litigated by the trial defense team, we are left with an incomplete record that could have been fleshed out through motions practice. Such conjecture could be argued in any case where a motion to suppress evidence, or any motion for that matter, was not raised by the trial defense counsel, which leads us down an unintended slippery slope of exposing counsel to undue scrutiny and burdening the justice system. *See Strickland*, 466 U.S. at 697 (finding that "Courts should strive to ensure that ineffectiveness claims do not become so burdensome to defense counsel that the entire justice system suffers as a result."). I decline to speculate as to what, if any, additional facts could have been uncovered had the issue been litigated. There is sufficient evidence in the record before us to resolve whether it was error for the trial defense team to not raise the issue, and whether the appellant has met his burden to show prejudice.

Reasonable Probability/Prejudice

In assessing prejudice under *Strickland*,[6] a court must examine whether "it is 'reasonably likely' the result would have been different" but for the conduct of counsel. *Strickland*, 466 U.S. at 698. "'When a claim of ineffective assistance of counsel is premised on counsel's failure to make a motion to suppress evidence, an appellant must show that there is a reasonable probability that such a motion would have been meritorious'" in order to meet its burden of demonstrating prejudice. *United States v. Jameson*, 65 M.J. 160, 163-64 (C.A.A.F. 2007) (quoting *United States v. McConnell*, 55 M.J. 479, 482 (C.A.A.F. 2001) (additional citation omitted)).

---

indication that Cpl Brooks questioned the appellant with the intent to "evade the accused's constitutional or codal rights." *Cohen* 63 M.J. at 50 (quoting *United States v. Bradley*, 51 M.J. 437, 441 (C.A.A.F. 1999)). Furthermore, even if he had reported the incident, discipline is at the discretion of the command, and there is no evidence that the matter would have been resolved in a punitive way vice informal counseling or no consequence at all.

[6] "When reviewing ineffectiveness claims, 'a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the [appellant].'" *United States v. Datavs,* 71 M.J. 420, 424 (C.A.A.F. 2012) (quoting *Strickland*, 466 U.S. at 697).

As "a reasonable probability" is unquantified in case law, it is this issue that causes the greatest amount of angst. Supreme Court case law decided after *Strickland*, and amplifying on the standard established in that case, intimates that the "likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011) (citation omitted).

Accordingly, it follows that a reasonable probability of the motion being meritorious should be substantial and not just conceivable. *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011); *see also Richter*, 562 U.S. at 112. The Supreme Court decisions after *Strickland* on this issue and elaborating on the standard established in that case suggest that, "reasonable probability of success" falls on the spectrum closer to a preponderance of the evidence than to frivolous, i.e., merely conceivable. *See Richter*, 562 U.S. at 111-12 (finding that "the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters 'only in the rarest case'") (quoting *Strickland*, 466 U.S. at 693)).

With the standard of a "reasonable likelihood" of the motion's success falling closer to a preponderance of evidence than just a possible or conceivable chance of success, on this record, I would find that the appellant failed to carry his burden to prove a reasonable possibility of success within the meaning of *Strickland*. I would, therefore, affirm his conviction, in accordance with the original majority opinion. I would also, like in the original majority opinion, find his sentence inappropriately severe, affirming only that part of the sentence as extends to reduction to pay grade E-1.

For the Court

R.H. TROIDL
Clerk of Court

19